**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI-DADE DIVISION**

**CASE NO:**

HOUSING OPPORTUNITIES PROJECT
FOR EXCELLENCE, INC., PAMELA CARTER,
CARLOS QUINONES, VANESSA CANO,
BERTHENIA MANNINGS, individually and as parent
of K.M., GRACIELA CISNEROS, and JULIAN
MITCHELL

      Plaintiffs

vs.

MIAMI PROPERTY GROUP, LTD., CHARTER
REALTY GROUP, INC., and PAULETTE
GOPAUL

      Defendants

_____/

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

COMES NOW, the Plaintiffs, HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC., PAMELA CARTER, CARLOS QUINONES, VANESSA CANO BERTHENIA MANNINGS, individually and as parent of K.M., GRACIELA CISNEROS, and JULIAN MITCHELL and sues Defendants, MIAMI PROPERTY GROUP, LTD., CHARTER REALTY GROUP, INC., and PAULETTE GOPAUL, and states as follows:

## INTRODUCTION

1. This is an action initiated for the denial of federally secured rights under the Fair Housing Act, Section VIII of the Civil Rights Act of 1964, as amended; and Section 504 of the Rehabilitation Act of 1973. The Defendants, MIAMI PROPERTY GROUP, LTD.,

*Disability Independence Group, Inc. * 2990 Southwest 35th Avenue * Miami, Florida 33133*

CHARTER REALTY GROUP, INC., own and operate three, project-based, Section 8 rental properties with 507 units in total –

    a. 183rd Street Apartments, located at 18451 NW 37th Avenue, Miami Gardens, Florida 33056 (hereinafter referred to as "183rd St. Apts."),

    b. 187th Street Apartments, located at 18665 NW 37th Avenue, Miami Gardens, Florida 33056 (hereinafter referred to as "187th St. Apts.")

    c. 22nd Avenue Apartments, located at 13875 NW 22nd Avenue, Opa Locka, FL 33054 (hereinafter "22nd Ave. Apts.")

(collectively referred to as "the Subject Apartments").  For each of these units, these Defendants charge a market rate rent.  The tenants are required to pay a defined percentage of their income, and the Department of Housing and Urban Development provides payment for the remainder of the monthly rent.  The occupancy for such units is approximately 99% occupied.

2. According to the most recent statistics maintained publically by the Department of Housing and Urban Development from the Defendants Tenant Income Certification information, the demographics of the Subject Apartments are as follows:

    a. Total number of residents in the Subject Apartments – 1148

    b. Over 97% of all residents are classified as very low income[1], and over 85% are extremely low income.[2]

    c. Approximately 6% of households have two adults with children, and 47% of the apartments have one adult with children.

---

[1] "Very low-income" is defined as 50 percent of the median family income for the area.
[2] "Extremely low-income" is defined as 30 percent of the median family income for the area.

    d.  At least 10% of all residents have one or more disabilities.

    e.  The Subject Apartments are 99% minority occupied, the majority of which are Black.

3. In order to maximize and perpetuate the value of their investment in the Subject Apartments, these Defendants undertook a six million dollar renovation program in 2004 which was completed in 2007. The renovation program included new roofs, building repainting, installation of forced air heating and cooling systems, new clubhouses, swimming pools, landscape and parking area upgrades, and upgrades to the interiors of some units. However, at the same time, these Defendants have systematically limited and denied the equal housing opportunity rights of its residents by promulgating rules and regulations and establishing practices which discriminate against persons based upon their sex, disability and familial status; and denied residents reasonable modifications or accommodations for their disabilities which would allow them equal use and enjoyment of the premises, including the common use areas.

4. Notwithstanding filing a complaint against the Defendants with the Department of Housing and Urban Development regarding these unfair housing practices, the Defendants have continued with these unfair housing practices, which has led to further discrimination, and even physical injury to its residents.

5. Plaintiffs seek immediate injunctive relief to cease such activities as well as damages and attorney's fees for the denial of equal housing opportunities based on disability, sex and familial status.

## JURISDICTION

6. This Court has jurisdiction pursuant to 42 U.S.C. §3613 as well as 28 U.S.C. § 1331 and 1343(a)(3) and (4). Claims are asserted pursuant to the Fair Housing Act, 42 U.S.C. §§3601, et seq., and to the extent that declaratory relief is sought, claims are asserted pursuant to 28 U.S.C. § 1367 and §§2201-2202.  Further, this Court has supplemental jurisdiction over State law claims pursuant to 28 U.S.C.§ 1367

7. Venue is proper in this District under 28 U.S.C. § 1391 as this is the district in which the events giving rise to the Plaintiffs' claims occurred and as this is an action which is not founded solely on diversity of citizenship.

## PARTIES

8. Defendant, MIAMI PROPERTY GROUP, LTD. (hereinafter referred to as "MIAMI PROPERTY"), is a Florida Limited Partnership, and licensed and doing business in Miami-Dade County, Florida.  MIAMI PROPERTY GROUP, LTD. owns and operates the Subject Apartments.

9. Defendant, CHARTER REALTY GROUP, INC. (hereinafter referred to as "CHARTER REALTY"), is a Foreign Profit Corporation, and licensed and doing business in Miami-Dade County, Florida. CHARTER REALTY is the management company responsible for operating the Subject Apartments and dozens of Section 8 and tax credit properties throughout the United States for the past fifteen years.

10. Defendant, PAULETTE GOPAUL (hereinafter referred to as "GOPAUL"), is an employee of Defendant, CHARTER REALTY GROUP, INC., the onsite property manager of both 183rd Street Apartments and 187th Street Apartments, and is otherwise *sui juris*.

11. The Plaintiff, PAMELA CARTER (hereinafter referred to as "CARTER"), is qualified person with a disability and currently resides at the 183rd St. Apts., with her children and three grandchildren, and is otherwise *sui juris*.

12. The Plaintiff, CARLOS QUINONES (hereinafter referred to as "QUINONES"), is qualified person with a disability and, currently resides at the 187th St. Apts., and is otherwise *sui juris*.

13. The Plaintiff, VANESSA CANO (hereinafter referred to as "CANO"), is qualified person with a disability and, currently resides at 187th St. Apts., and is otherwise *sui juris*.

14. The Plaintiff, BERTHENIA MANNINGS, individually, and as parent of K.M., is the mother of a child with a disability and grandmother to several children, and currently resides with her children and grandchildren at 187th St. Apts., and is otherwise *sui juris*.

15. The Plaintiff, GRACIELA CISNEROS, is qualified person with a disability and, currently resides at the 22nd Ave. Apts., and is otherwise *sui juris*.

16. The Plaintiff, JULIAN MITCHELL, is qualified person with a disability and, currently resides at the 22nd Ave. Apts., and is otherwise sui juris.

17. The Plaintiff, HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC. (hereinafter referred to as "HOPE"), is a private, Florida not-for-profit, 501(c)(3) corporation established in 1988, one of three in Florida dedicated to eliminating housing discrimination and promoting fair housing. HOPE employs a three-tiered system of private enforcement, education outreach and counseling to achieve its mission to affirmatively further fair housing. Its programs are designed to ensure that people are offered the right to select housing of their choice without discrimination based on race, religion, color, national origin, sex, disability, marital or familial status, or such other protected classes as

may be conferred by federal, state or local laws. HOPE is the only private not-for-profit

fair housing organization in Miami-Dade and Broward Counties engaged in testing for fair

housing law violations, and pursuing enforcement of meritorious claims.

## DISCRIMINATORY RULES, REGULATIONS AND PRACTICES

18. On May 20, 2013, CHARTER REALTY distributed "Revised House Rules" to residents

of the Subject Apartments with a cover letter dated May 20, 2013 and several attachments,

which advised residents such rules would go into effect in thirty (30) days. *See* Revised

House Rules dated May 2013 attached hereto as Exhibit "A".

19. In said document, the Defendants included a "Fair Housing Statement" which expressly

discouraged accommodations or modifications under the Fair Housing Act:

> **Management staff at your community has a legal obligation to treat each individual in a consistent manner. Please do not put them in the difficult position of denying a request for an exception to the written policy.**

See House Rules- Lease Attachment #3 attached hereto as Exhibit "B".

20. Consistent with their Statement, modifications and accommodations were routinely

delayed or denied. Pursuant to Section 504 of the Rehabilitation Act, an entity must pay

for a reasonable accommodation needed by the individual (e.g., a ramp to a unit) unless

providing that accommodation would be an undue financial and administrative burden or

a fundamental alteration of the program.

## DISCRIMINATORY POLICIES BASED UPON DISABILITY

21. It is defendant's policy that upon being notified that a person has a disability, or if a person

is in receipt of disability-related benefits, whether or not they have requested an

accommodation, to require such person to sign a "Handicapped/Disabled Verification"

Form, attached hereto as Exhibit "C".

22. The "Handicapped/Disabled Verification" Form requires the resident to disclose any information requested by CHARTER REALTY.

> "I hereby authorize the release of any information requested regarding my handicapped/disabled status in order to determine whether Or[sic] not I meet the following criteria for purposes of eligibility."

23.  There is only an income eligibility in order to rent at the Subject Apartments and there are <u>no</u> criteria for eligibility for residency based on disability status, and such inquiry and invasive requests for information are without any legitimate purpose.

24. It is unlawful for a housing provider to (1) ask if an applicant for a dwelling has a disability or (2) if a person intending to reside in a dwelling or anyone associated with an applicant or resident has a disability, or (3) ask about the nature or severity of a disability of such persons.

**BARRIERS IN REQUESTING REASONABLE MODIFICATION OF THE RULES TO HAVE AN ASSISTANCE ANIMAL OR LIVE-IN AID**

25. Defendants sent a notice to all residents, dated July 1, 2013, regarding Live-In Aides and Assistance Animals that reminded residents who have a live-in aide and/or an assistance animal that they must re-apply for approval from management by August 1, 2013, even if the aide and/or animal was previously approved by management, and the failure to re-apply would lead to the rejection of the accommodation. Notice attached hereto as Exhibit "D".

26. The Revised House Rules include rules specifically related to residents who require a service animal or emotional support animal due to a disability. Such rules explicitly state the following:

> a.  This is a NO PET property. Residents may not have pets. Guests may not bring pets onto the Property, which includes into apartments and common areas. Violation of this rule is a material violation of the Lease Agreement, which constitutes grounds for eviction or termination.

HOPE, INC. v. MIAMI PROPERTY GROUP, LTD.
Page 8 of 46

    b.  Residents who require a service or companion animal due to a disability (referred to as an "Assistance Animal") may request that Management make reasonable accommodations to allow such an animal in accordance with the property's Assistance Animal Policy. Copies of the policy are available in the Management Office upon request. As explained in greater detail therein,

       i.  <u>Management must verify the need for the animal with the resident's health care provider.</u>
      ii.  <u>The need must be based on a disability that impairs the resident's ability to perform daily life tasks or to alleviate symptoms of a disability.</u>
     iii.  <u>If approved for an Assistance Animal, the resident must enter into an Assistance Animal Agreement with Management, which includes providing proof of compliance with animal vaccination and licensing requirements.</u>
     iv.  <u>These requirements must be met before any Assistance Animal is allowed on the property.</u>

    c.  Residents who have any animal on the Property as of the effective date of these Rules must apply by August 1, 2013 to have an animal approved as an Assistance Animal. <u>This is necessary even if the resident obtained prior permission (written or oral) for the animal before these Rules went into effect.</u> Animals that are not approved Assistance Animals may not be on the Property after July 15, 2013. Management will call animal control to remove any such animals from the Property after that date.

*See* Exhibit A, P. 3, Nos. 1-3.(emphasis ours).

27. In addition to signing a release for all medical information, all applications for an assistance animal as an accommodation, are required to fill out a packet of requests, rules and medical authorizations, attached as Exhibit "E".

28. Further, the  promulgated and enforced rules related to Assistance Animals, requires that the applicant or resident, requesting an accommodation for a disability sign an authorization allowing Defendants to contact the applicant or resident's healthcare provider to fill out a four-page Service/Assistance Animal Verification Form.

29. There are additional rules in effect, that are also unduly invasive and discourage the provider and the resident from obtaining a service animal, such as:

*Disability Independence Group, Inc. * 2990 Southwest 35th Avenue * Miami, Florida 33133*

a. The provider must sign a letter attesting to the fact that he or she would testify in Court, if necessary;

b. The provider must fill out a form attesting to the fact that the resident is substantially impaired, the animal is necessary, how the animal addresses the disability, the type of animal that the resident requires, whether the animal is admissible in the common areas, even though all other animals are prohibited and the length of the disability.

30. Further, the questionnaire by the medical professional and the resident must be sworn under penalty of perjury and advises that providing false information is a misdemeanor, and places the following warning on the forms:

**Penalties for misuse of the application or verification form**

Title 18, Section 1001 of the U.S. Code states that a person is guilty of a felony for knowingly and willingly making false or fraudulent statements to any department of the United States Government.  HUD, the PHA and any owner (or any employee of HUD the PHA or the owner) may be subject to penalties for unauthorized disclosures or improper uses of information collected based on the consent form.  Use of the information collected based on this verification form is restricted to the purposes cited above.  Any person who knowingly or willfully requests, obtains or discloses any information under false pretenses concerning an applicant or participant may be subject to a misdemeanor and fined not more than $5,000.  Any applicant or participant affected by a negligent disclosure of information may being civil action for damages, and seek other relief, as may be appropriate, against the officer of employee of HUD, the PHA or the owner responsible for the unauthorized disclosure or improper use.  Penalty provisions for misusing the social security number are contained in the Social Security Act at 208(a)(6), (7) and (8).  Violation of these provisions are cited as violations of 42 U.S.C. 4098(a)(6), (7), and (8).

Such provision has no applicability to the doctor or resident, and is solely used to intimidate or interfere with the resident's right to have an accommodation. Further, the information

being required is not for submission to U.S. HUD. The accommodation request is going to the housing provider directly.

31. As a further condition to having an assistance animal, the resident must enter into an "Assistance Animal Agreement" which sets terms and conditions for having an assistance animal, which include the following:

   a. If the animal is unsupervised, the management will contact animal control, and the resident may not be permitted to continue to have an assistance animal.

   b. Assistance animals may not make noise that disturbs other tenants, and must behave in accordance with standards for a well-behaved pet.

   c. If an animal is left unattended for 24 hours or more, then management will remove the animal from the premises, and not allow it back on the property.

   d. The animal must not interfere with the routine activities of other tenants.

   e. If the management believes that an animal is ill or in poor health, it can remove the assistance animal.

32. The resident must list a "responsible party" in the event that the resident dies, is incapacitated, or unable or unwilling to properly care for the assistance animal, in the determination of management.

33. The use of an invasive questionnaire, specification of specious penalties for falsification, the requirement of a written agreement, promulgation of additional requirements, and baseless time frames all constitute a practice of discouraging and preventing persons from obtaining an accommodation.

## OTHER REASONABLE ACCOMMODATIONS AND MODIFICATIONS

34. Further, as a condition to receiving any accommodation and/or modification, Defendants require the tenant to enter into an "Agreement" that limits the resident's rights under Section 504 or the Fair Housing Act.

**FAILURE TO MAKE REQUIRED ACCESSIBLE ALTERATIONS**

35. Despite expending over six million dollars in altering the Subject Apartments, MIAMI PROJECT and CHARTER REALTY failed to comply with the requirements of Section 504, and make at least five percent of dwelling units, as well as its common areas, facility and elements accessible for persons with disabilities in conformance with sections 3–8 of the Uniform Federal Accessibility Standards ("UFAS").

36.  The inaccessible elements are located throughout the properties, including, but not limited to:

    a.  Failure to have an accessible path of travel throughout the facility, from the entry gates, to each and every public element, including the pool, playground, and laundry rooms.

    b.  Units and laundry facilities fail to have a ramp into the unit or laundry facility, and instead there is a step.  In some of the 22nd Ave. Apts., CHARTER REALTY and MIAMI PROPERTY  have constructed ramps that exceed a 25% slope, which constitutes a danger for persons with mobility impairments  (anything more than 8.3% is not safe for independent use); and

    c.  Failure to have adequate accessible parking.

**DISCRIMINATORY RULES THAT EFFECT FAMILIES WITH CHILDREN**

37. The Revised House Rules include rules specifically related to conduct which restrict the equal use and enjoyment of families with children and demonstrate a discriminatory animus against families with children, including the following:

   a. The rules include a curfew provision which states, "Curfew is dark or 9:00pm. All persons under age 18 must be in their apartment by that time. There will be no exceptions to this policy." Miami-Dade does not have a curfew of this nature and restricts the use and enjoyment of families with children.

   b. The rules also restrict residents and/or their guests from playing, loitering or biking in the parking lots, laundry facilities, interior common areas and/or walkways and prohibit the use of skateboards, bicycles, motorized or other vehicles on the sidewalks, hallways, and other common areas of the subject properties.

   c. The rules provide that "Residents' personal items, including toys, playthings, or sports equipment, may not be left unattended," a provision that demonstrates animus against families with children.

   d. In addition, the swimming pool at the 183rd and 187th Street apartments within two gates inside the gated facility, is available for use only during management office hours (Monday through Friday, 9:00am to 5:00pm), during which time children are in school. The complainant asserts that this policy adversely affects the ability of school-aged children to use and enjoy the swimming pool after school and on weekends. On July 31, 2013, Defendants were advised by HUD that such rules contain multiple violations but have done nothing since being on notice that this policy violates the Fair Housing Act.

    e.   Children under 18 are not permitted in the playground area unattended by a guardian.

    f.   Families with Children are not permitted to use the pavilions for birthday parties or other events;

    g.   Such rules are actively enforced by uniformed security guards hired by the management company.

38. CHARTER REALTY fails to maintain the playground area, nor is there a designated area for children to play and ride bicycles.

## DISCRIMINATION BASED ON SEX/ VIOLENCE AGAINST WOMEN ACT

39. Females are disproportionately more likely than males to be victims of domestic violence. The rules adversely discriminate against victims of domestic violence, which historically applies to women.  The Revised House Rules include rules specifically related to conduct which adversely affect tenants or residents involved in a domestic violence situation, including the following:

12. IF THE POLICE ARE CALLED TO THE PROPERTY BECAUSE OF ANY TYPE OF DISTURBANCE OR VIOLATION, THE RESIDENT(S) INVOLVED- DIRECTLY~ OR AS THE HOST OF AN OFFENDING GUEST·· MAY RECEIVE A THIRTY (30) DAYWRITTEN NOTICE OF LEASE TERMINATION.

*See* Exhibit A attached hereto. P. 9, No. 12.

## RULES AND REGULATIONS

40. Residents of the Subject Apartments were instructed to sign and date an agreement and acknowledgment clause on page twenty (20) of the Revised House Rules, and return it to the leasing office by June 19, 2013.

41. After being contacted by several residents of the Subject Apartments and noting various per se discriminatory housing practices in the rules and regulations, HOPE employees

visited the property and expended its scarce resources on many different occasions. During these visits, HOPE employees met with residents in small groups and individually regarding their complaints in all areas of housing discrimination, and along with such residents, drafted a Fair Housing Complaint to submit to HUD.

42. After complaints from residents, CHARTER REALTY sent a memorandum to the tenants explaining the reason for such changes, and implied that such changes were with the approval and imprimatur of HUD by stating, "The House Rules were revised by Charter's attorneys at corporate headquarters, in consultation with HUD and experts in Section 8 properties."  Memorandum dated June 4, 2013 attached hereto as Exhibit "F".

43. On July 23 2013, HOPE, filed a Fair Housing Complaint with the U.S. Department of Housing and Urban Development regarding the unlawful rules and regulations.  The complaint contained thirty different complainants who are residents of the Subject Apartments.[3] Additional complaints have been filed since the July 23, 2013 filing. HUD Fair Housing Complaint attached hereto as Exhibit "G".

44.  Since the filing of the complaint, MIAMI PROPERTY and CHARTER REALTY have continued to enforce the unlawful polices and have discriminated against the residents of the Subject Apartments.

45. Despite the existence of the complaint, the continuing practices of the defendants irreparably harm the purpose and mission of HOPE and Defendants' discriminatory actions

---

[3] Patrica Bostick, Ramona Brown, Salvador Cabral, Vanessa Cano, Grace Carmichaer, Pamela CARTER, Tiffany Chavis, Maketha Clark, Lenora Dames, Estaban Garcia, Angel Gillum, Termica Gray, Tara Johnson, Patricia Lively, Lakevia Lous, Bertherna MANNINGS, Miriam MANNINGS, Yvonne McElhaney, Tyrena Miller, Valaria Mitchell, Brandy Parker, Kimberly Rivera, Tracy Scott, Trania Scott, Tanya Smith, Stacy Tyler, Theresa Tyler, Denise Wallace, Nakisha Westbrooks, Quilmillionare Wilson

have (1) interfered with the efforts and programs of HOPE which are intended to bring about equality of opportunity for all persons regardless of race or color; (2) forced HOPE to devote scarce resources to identify and counteract Defendants' unlawful housing practices and to otherwise divert those same resources from its education, counseling, and referral services; (3) interfered with the right of HOPE's constituents to enjoy the benefits of living in a community which does not discriminate against persons based on disability, gender, and familial status; and, (4) frustrated HOPE's mission and purpose of promoting the equal availability of housing to all persons without regard to race, color, religion, gender, national origin, familial status, or disability.

## FACTS RELATED TO SPECIFIC PLAINTIFFS – PAMELA CARTER

46. PAMELA CARTER lives at the 183rd St. Apts. her son and her three grandchildren, ages five, seven, and nine.

47. Ms. CARTER lives with multiple disabilities that manifest themselves in a readily apparent mobility impairment.  Due to her limited mobility, Ms. CARTER uses a walker to assist her with mobility.

48. Ms. CARTER family of several children under 18 year old is limited from full and equal opportunity to use the facilities due to their familial status.

49. There is a step into Ms. CARTER's apartment that she has difficulty navigating due to her mobility impairment, and she has difficulty using the bathroom facilities and bathtub. Further, due to the physical inaccessibility of the development, Ms. CARTER's use and enjoyment of the premises is limited.  For example, Ms. CARTER cannot watch her grandchildren play in the playground as there is no access to the playground for a person with mobility impairments.

50. Prior to contact with HOPE, Ms. CARTER was not aware of the obligations of the Defendants to make her apartment or common areas readily accessible and usable by individuals with disabilities.

51. On August 7, 2013, Keenya Robertson of HOPE, wrote a letter on behalf of Ms. CARTER to Charter Realty Group alerting the Defendant of Ms. CARTER's obvious disability and making a request for grab-bars in her bathroom and a ramp at the entrance of her unit under both Section 504 and the Fair Housing Act.

52. On August 16, 2013, Ms. Rockwell promised to install grab bars within ten days and begin to research how to install a ramp, but promised to respond with two weeks.  Ms. Rockwell acknowledged the issues Ms. Robertson had with the house rules and maintained that HUD was reviewing the rules.

53. On September 26, 2013, Property Manager GOPAUL sent correspondence to Ms. CARTER confirming that their grab bars were installed the week prior to September 26, 2013, but they needed more time to evaluate the design of a ramp allowing them access into and out of their home.

54. CHARTER REALTY only installed grab bars by the bathtub/shower area, and not the toilet area.

55. On October 11, 2013, Ms. Robertson advised CHARTER REALTY that a temporary (portable) ramp would not be an adequate solution to providing Ms. CARTER ingress and egress out of her home as it would be a dangerous option for Ms. CARTER.  Further, Ms. Robertson re-affirmed that the grab bar request included both Bath tub **and** toilet grab bars.

56. At the time, Ms. Robertson provided CHARTER REALTY a sketch of a ramp that would allow Ms. CARTER full and independent ingress and egress out of her home. The sketch

was drafted by HOPE employee Danny Howe, who was previously the ADA Coordinator for Miami-Dade Housing Authority.

57.  On October 14, 2013, Ms. Rockwell advised Ms. Robertson that, despite the request that was made in August, Ms. CARTER did not want a ramp and only wants a grab bar at the exterior of the unit.  Further, any ramp out of Ms. CARTER's unit would be "not feasible or practical" for several reasons.

58. In addition, Ms. Rockwell disagreed with the contention that they should have known that a request for bathroom grab bars also includes toilet-area grab bars and, as such, did not provide Ms. CARTER a toilet grab bar. Further, Ms. Rockwell suggested that Ms. CARTER's health insurer provide her with grab bars and a raised toilet seat, and management would install such devices as was commonly done in the past.  Ms. Rockwell was upset at Ms. Robertson for suggesting that it was Charter Management's responsibility to provide such accommodations.

59. On October 15, 2013, Keenya Robertson, on behalf of Ms. CARTER disagreed with Ms. Rockwell's account and advised that Ms. CARTER's request for a ramp had not been withdrawn and again demanded ramp at the entrance of her unit.  Further, Ms. Robertson clarified that a mobile or portable ramp would not be suitable for Ms. CARTER as such accommodation would not be safe.  Further, Ms. Robertson demanded that she needs the ramp now for her mobility impairment.

60. Notwithstanding HOPE's letter, on October 23, 2013, Sheri Rockwell sent a letter to Ms. Robertson requesting Ms. CARTER's weight and the model chair that Ms. CARTER expects to receive from her insurer.

61. In February 2014, Ms. CARTER's daughter passed away after having a long fight with lung disease.  On February 26, while mourning, Defendant GOPAUL bypassed Ms. Robertson (and HUD) and requested from Ms. CARTER, that she provide information about her weight before installing any device for her.  Ms. CARTER does not know her weight and has not been weighed by a doctor, but her weight visibly exceeds 300 pounds. However, such inquiries were not made when the grab bars mounted to the bathtub were installed.  In addition, there are several types of grab-bars in which weight is less of an issue, such as floor-mounted grab bars or fixed grab bars that are attached to the floor and the wall.

62. Despite the fact that the accommodations were handled by HOPE, HOPE was not sent the letter.  No grab bars were installed in the bathroom, and Ms. CARTER continued to use the door knob to assist her in standing and sitting onto the toilet.

63. April 23, 2014,   Ms. GOPAUL sent a letter to Mrs. CARTER following up on the status of the wheelchair as a new condition to get a ramp:

> Almost eight (8) months have passed, and I have not yet seen you with a wheelchair.  In our many conversations since then, you've not mentioned that you have yet obtained a wheelchair or that you would be getting one anytime soon.  Also, when I've gone to your unit, I've not seen a chair.  The purpose of this letter is to clarify your plans to obtain a wheelchair before we can proceed to make plans for a ramp…. If I don't hear from you, I will assume you no longer plan to obtain a wheelchair and therefore, do not need a ramp installed."

64. On May 9, 2014, Keenya Robertson, on behalf of Ms. CARTER again reiterated the nine month old accommodation request as such request is needed for a walker.

65. On or about May 12, 2014, Ms. Johnnye Lewis, another resident with a disability at the 22nd Ave. Apts., tripped over a concrete ramp with an over 25% slope and became severely injured as a result of her fall.

66. Just **four** months prior to her fall, Ms. Lewis, through HOPE, Inc., filed a complaint with HUD stating that  on August 18,2013, the Ms. Lewis approached the property manager to explain that her ramp was too steep, expressing concern that she could fall due to its configuration. As such, she requested that the ramp be altered so that she could get in and out of her unit without fear of falling. The property manager denied the Ms. Lewis' request and informed her that there should not be a ramp there to begin with.

67. As a result of Ms. Lewis' fall, on May 19th, Ms. Rockwell, agreed that Ms. CARTER can have a permanent ramp with a design similar to that proposed by Mr. Howe of HOPE, in October.  Further, in such letter, Ms. Rockwell misrepresented to Ms. Robertson that a new toilet and grab bars were installed at Ms. CARTER's apartment.  In order to receive the ramp, Ms. Rockwell wanted Ms. CARTER to sign an agreement "Confirmation of Ramp Installation".

68. On or about May 19th, Ms. CARTER slipped and fell when she attempted to use the bathroom door knob to stand after using the toilet.  As a result of the fall, Ms. CARTER suffered injury, causing a two week hospitalization and several weeks of planned convalescent time.

69.  After her accident, the Defendants are now refusing to install the ramp unless they receive confirmation from Ms. CARTER's medical providers that she is able to continue to live on the premises and under what condition that this may be possible.  Further, despite the prior

assertion that the Ms. CARTER was provided with toilet grab bars, the Defendants again requested weight information.

70. Ms. CARTER would like an apartment that has a usable ramp, as well as grab bars by her toilet, and all other modifications that are available in a unit conforming to UFAS standards.

71. Ms. CARTER was elected as and is presently secretary to the tenant's counsel of the 183rd St. Apts.

72. However, on October 10, 2013, Sherri Rockwell advised Legal Services of Greater Miami attorney, Rebecca Schram, that a HUD complainant could not represent the tenant association in any meeting with management.

73. Later, after HOPE reported these retaliatory acts to HUD, on December 6, 2013, Defendants revoked their prior position and stated that parties to HUD complaints could represent the Tenant Council.

**FACTS RELATED TO SPECIFIC PLAINTIFFS – GRACIELA CISNEROS**

74.  GRACIELA CISNEROS lives at the 22nd Ave Apts. with her minor daughter.

75. Ms. CISNEROS is a person with a disability as defined by the Fair Housing Act and the Section 504 of the Rehabilitation Act.

76. Ms. CISNEROS and her daughter under 18 year old is limited from full and equal opportunity to use the facilities due to their familial status.

77.  In May of 2012, Ms. GRACIELA CISNEROS obtained approval of her emotional support animal from Defendants and has had the assistance animal since that time.

78. After May 20, 2013, pursuant to the new rules, in order to keep her assistance animal, the residents would be required to re-initiate, in writing, her need for an assistance animal and otherwise comply with the rules for doing so.

79. The Rules further specify that the residents' need for an assistance animal must be independently verified with the residents' healthcare provider by management. Further, the Rules note that the residents' failure to comply with these revised policies would result in adverse action including removal of previously approved but now considered "unauthorized assistance animals", with potential for lease violations and eviction proceedings.

80. Ms. CISNEROS was required by management to sign a release that would grant management to contact her health care provider directly and inquire about the nature and severity of her disability or handicap.

81. Ms. CISNEROS would like to keep the accommodation previously approved without further intrusive search into her physical or mental condition, and would like to have equal opportunity to enjoy the premises for herself and her child.

**FACTS RELATED TO SPECIFIC PLAINTIFFS – CARLOS QUINONES**

82. CARLOS QUINONES is an elderly man who lives alone at the 187th St. Apts.

83. Mr. QUINONES has a mobility impairment and uses a motorized wheelchair to ambulate. Mr. QUINONES' disability is open and obvious to Defendant's agents and employees.

84. Prior to contact with HOPE, Mr. QUINONES was not aware of the obligations of the Defendants to make his apartment or common areas readily accessible and usable by individuals with disabilities.

85. Prior to 2013, Mr. QUINONES lived in a two bedroom apartment with an entrance to the apartment onto a passageway that was large enough to accommodate his home-made wooden ramp that he would use for ingress and egress into his apartment.

86. In 2013, with less than one week notice, Defendants required Mr. QUINONES to move to a one bedroom apartment.  Such apartment had a six inch step into the apartment.

87. Soon after moving in, Defendant GOPAUL and a police officer confronted Mr. QUINONES and advised him that his home-made ramp was a hazard and dangerous due to the size of the ramp and lack of space on the sidewalk for such ramp.

88. Mr. QUINONES was intimidated by the presence of law enforcement during the visit as there had been no inquiry from management regarding the plywood ramp while being used at his previous unit, which was located on a more remote location.  His current unit sits on a main walkway.

89. On August 7, 2013, Keenya Robertson of HOPE, wrote a letter on behalf of Mr. QUINOINES to Charter Realty Group alerting the Defendant of Mr. QUINONES' obvious disability and making a request for grab-bars in his bathroom and a ramp at the entrance of his unit under both Section 504 and the Fair Housing Act.

90. On August 16, 2013, Ms. Rockwell promised to install grab bars within ten days and begin to research how to install a ramp, but promised to respond with two weeks.  Ms. Rockwell acknowledged the issues Ms. Robertson had with the house rules and maintained that HUD was reviewing the rules.

91. On September 26, 2013, Property Manager GOPAUL sent correspondence to Mr. QUINONES confirming that their grab bars were installed the week prior to September 26,

2013, but they needed more time to evaluate the design of a ramp allowing them access into and out of their home.

92. CHARTER REALTY only installed grab bars by the bathtub/shower area, and not the toilet area.

93. On or about October 22, 2013, Mr. QUINONES was provided with an agreement for a ramp that was installed at his doorway.  The ramp was a portable, suitcase-style, ramp that cannot be used without assistance.  The slope and weight requirements of the ramp make such use dangerous and infeasible.  Such agreement required him to acknowledge that ramp is to be used to push wheelchair in and out of unit and that no person is to be sitting in his wheelchair when using ramp.

94. As a result of attempting to move a wheelchair out of a doorway un-occupied, the wheelchair has fallen and has had to be lifted up from the ground.  It presents a constant danger to Mr. QUINONES or others who attempt to assist Mr. QUINONES.

95. Mr. QUINONES would like to live in an apartment where he can enter and leave his apartment without getting out of his wheelchair and using a portable ramp.

**FACTS RELATED TO SPECIFIC PLAINTIFFS – BERTHENIA MANNINGS**

96. BERTHENIA MANNINGS lives at the 187th St. Apts.  She is the mother of a fifteen year old son, K.M., as well as the grandmother of two minor children.

97. K.M. lives with Autism and is substantially limited in his daily life activities. MANNINGS is associated with a person with a disability.

98. Ms. MANNINGS' family of several children under 18 year old is limited from full and equal opportunity to use the facilities due to their familial status.

99. As a result of his Autism, K.M. is hypersensitive to environmental stimulus and has extreme social disabilities.  As a result of such, his therapist prescribed a service animal as a form of treatment for K.M.

100. On September 13, 2013, HOPE requested a reconsideration for Ms. MANNINGS as she needed her air condition repaired as her son has a disability which causes him to get sick and vomit if he overheats.  Ms. Manning had asked Defendants if they could fix the air condition on that day and the property manager said that it could not be done because there are other people ahead of her.  HOPE obtained such accommodation from the Defendant after several attempts after the original denial.

101. On October 9, 2013, a letter was sent to MANNINGS stating it was the final request for her to complete the application process to see if she is entitled to an assistance animal for her child, who she "contends has autism". The forms needed to be completed by December 13, 2013 at 3:00p.m.

102. On November 4, 2013, GOPAUL sent letter to MANNINGS stating that an extensive application, including a third party is needed to show proof of needing the requested accommodation is required.  The Defendants had already received a letter from K.M.'s health care provider.

103. On December 12, 2013, Ms. MANNINGS met HUD manager Vicki Johnson and Ms. Johnson instructed MANNINGS not to complete application package for service animal requiring release of medical records for independent verification with health care provider by management.

104. Despite the instruction by Ms. Johnson, GOPAUL continued to request such information from Ms. MANNINGS.

105.  On December 27, 2013, Defendants sent correspondence to Ms. MANNINGS permitting the service animal for her son, conditioned upon signing an Assistant Animal Agreement and Assistance Animal Registration Form in order for this accommodation to be allowed. The letter states that signing the agreement and registration document are not optional; even if her son was approved to have an animal, she must still agree to follow certain rules.

106.  Ms. MANNINGS would like to keep the accommodations for her son KM without further intrusive search into his physical or mental condition, and would like to have equal opportunity to enjoy the premises for herself and her children and grandchildren

## FACTS RELATED TO SPECIFIC PLAINTIFFS – VANESSA CANO

107.  VANESSA CANO is a young woman who lives alone at the 187th St. Apts.

108.  Ms. CANO has an obvious mobility impairment and uses a metal cane to assist her to ambulate.  Ms. CANO has lupus and the disease progressed to damage her hip joints.

109.  Notwithstanding her obvious disability, in February 2011, Ms. GOPAUL placed Ms. CANO in a second floor apartment with access only by stairs.  At such time, Ms. GOPAUL advised Ms. CANO that she was going to put CANO where she wanted to.  CANO had no choice as to where her unit would be.

110.  Prior to contact with HOPE, Ms. CANO was not aware of the obligations of the Defendants to adopt suitable means to ensure persons with disabilities are made aware of the availability of accessible units and to maximize use of accessible units by individuals needing the features of these units.

111.  In June of 2013, CANO requested a designated parking space for her to accommodate her disability as the parking lot was beginning to be filled and she could not obtain a

parking spot.  In response to her inquiry, CANO was advised that the parking lot had all of the disabled parking that it needed.

112.  Even though she has a chronic condition and has been obviously disabled since moving to the Subject Apartments, Ms. CANO explained that she needed the space for her hip replacement surgery.

113.  CANO requested a parking space again in August 2013

114.  An accessible parking space was placed in the parking lot in November 2013.  However, the space was not designated for Ms. CANO, and anyone with a handicapped placard parked in the space.  As such, the space was not available for Ms. CANO

115.  On December 9, 2013, a confirmation letter was given to VANESSA CANO stating that the reasonable accommodation request for a parking space was temporarily honored.  The letter states that management responded to the request within 2 weeks and was ready before she returned home from her surgical procedure. The letter also confirmed that the space meets the needs of VANESSA CANO during her recovery period.  The letter speaks for CANO and they had her sign the letter as a condition of her being able to use the space.

116.  Ms. CANO is not going to recover from Lupus and will always be mobility impaired.

117.  On May 29, 2014, the Defendants added the word "reserved" to the accessible space sign. It now appears that the space is reserved for persons with handicapped placards, and not for Ms. CANO.  She has no expectation that the Defendants are able to designate a space for her use.  Even though they added the word "reserved" to the sign, it does not indicate that it is for anyone in particular and continues to be used by others who have a placard in their vehicle.

118. Ms. CANO would like to live in a first floor unit at the 187th St. Apts. so she does not need to walk down a flight of stairs, and would like grab bars in her unit bathroom.

## FACTS RELATED TO SPECIFIC PLAINTIFFS – JULIAN MITCHELL

119. JULIAN MITCHELL is a man who has a disability within the meaning of the Fair Housing Act and the Rehabilitation Act of 1973.  Mr. MITCHELL lives at the 22nd Ave. Apts.

120. On January 28, 2014, Mr. MITCHELL was required to sign a form release of medical records and independent verification of benefits, even though he did not request an accommodation or modification.

121. Mr. MITCHELL does not want unnecessary disclosure of his medical information without any need or purpose.

122. All Plaintiffs have retained Disability Independence Group, Inc., to represent them in this action, and have agreed to pay them a reasonable fee for their services incurred herein.

## COUNT I- SECTION 504 of the REHABILITATION ACT OF 1973

123. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 122 above as though fully set forth herein.

124. Defendants MIAMI PROPERTY and CHARTER REALTY are entities subject to Section 504 of the Rehabilitation Act of 1973 as they are recipients of HUD financial assistance in the operation of programs or activities receiving such assistance

125. Plaintiffs QUINONES, CANO, MANNINGS, CARTER, MITCHELL, CISNEROS and HOPE, are either individuals with disabilities or associated with individuals with disabilities.

126.  Defendants MIAMI PROPERTY and CHARTER REALTY failed to ensure that all non-housing programs are operated in a manner that does not discriminate on the basis of disability and that alterations of non-housing facilities are made accessible in accordance with the Uniform Federal Accessibility Standards or other applicable accessibility standards.

127.  Defendants MIAMI PROPERTY and CHARTER REALTY failed and continue to fail to operate their existing housing programs in a manner that does not discriminate on the basis of disability, and failed to take any steps to ensure that existing housing programs are readily accessible to and usable by persons with disabilities.

128.  Defendants MIAMI PROPERTY and CHARTER REALTY failed to provide and continues to fail to timely provide reasonable accommodations which may be necessary for a person with a disability to use or participate in the program, service or activity.

129.  The following acts of the Defendants are in violation of the Section 504 of the Rehabilitation Act to receive an accommodation:

   a.  Requiring a release for medical records or other burdensome evaluations as a condition to request an accommodation.

   b.  Requiring a resident to re-apply for an accommodation that has previously been provided.

   c.  Requiring a resident to provide a release medical information when no request is made.

   d.  Placing onerous conditions on the receipt of an accommodation

   e.  Requiring a written agreement to receive an accommodation that limits the use or rights under law

130.  Defendants MIAMI PROPERTY and CHARTER REALTY failed and continue to fail to pay for a reasonable accommodations needed by its tenants.  This includes but is not limited to

    f.   Providing and paying for grab bars or accessible toilet seats.

    g.   Providing and paying for accessible ramps to and from units,

    h.   Providing and paying for designated parking spaces for persons with disabilities.

131.  Defendants MIAMI PROPERTY and CHARTER REALTY failed to ensure that the six million dollars' worth of substantial alterations, when undertaken, met the requirements for new construction and filed to ensure that all other alterations, to the maximum extent feasible, meet the requirements of the Uniform Federal Accessibility Standards (UFAS) or other applicable accessibility standards.  This includes the failure to make at least five percent of dwelling units, as well as its common areas, facility and elements accessible for persons with disabilities in conformance with sections 3–8 of the Uniform Federal Accessibility Standards

132.  Due to the failure of Defendants MIAMI PROPERTY and CHARTER REALTY to make modifications in the units to accommodate their residents' disabilities, Defendants MIAMI PROPERTY and CHARTER REALTY failed to make up to five percent of such units meet UFAS standards in the process of making accommodations in such units.

133.  Defendants MIAMI PROPERTY and CHARTER REALTY failed and continue to fail to distribute accessible dwelling units throughout projects and sites and make such units available in the same ranges of sizes and amenities to provide housing choices for persons with disabilities that are the same as those provided to others.

134.  Defendants MIAMI PROPERTY and CHARTER REALTY failed and continue to fail to adopt suitable means to ensure persons with disabilities are made aware of the availability of accessible units and to maximize use of accessible units by individuals needing the features of these units.

135.  Such failure to remove architectural barriers during the substantial alterations to the Subject Apartments and make apartments accessible during renovations discriminated against CISNEROS, QUINONES, CANO, MANNINGS, CARTER, MITCHELL and HOPE, by excluding them from the participation in, denying them benefits of, and subjecting them to discrimination solely by reason of his and her disability or the disability of those individuals with whom they are related and denying such persons full access necessary for the use and enjoyment of the property.

136.  Defendants MIAMI PROPERTY and CHARTER REALTY failed and continue to fail to notify their renters of the non-discriminatory requirements of their programs.

137.  Due to Defendants' discriminatory actions, Plaintiffs CISNEROS, QUINONES, CANO, MANNINGS, CARTER, MITCHELL and HOPE Inc., and those associated with Plaintiffs have suffered and will continue to suffer direct and indirect injuries until Defendants are compelled to comply with the requirements of Section 504 of the Rehabilitation Act and the Fair Housing Act.

138.  Plaintiffs, CISNEROS, QUINONES, CANO, MANNINGS, CARTER, MITCHELL, as well as any other residents at the Subject Apartments, are denied the opportunity to participate and benefit from the goods, services, privileges, advantages, facilities and accommodations at the Subject Apartments equal to those afforded to individuals without mobility disabilities.

139.  Defendants, MIAMI PROPERTY and CHARTER REALTY, had knowledge of their obligations under Section 504 of the Rehabilitation Act of 1973 and the Fair Housing Act and were deliberately indifferent to the rights of Plaintiffs, and other individuals with disabilities who are similarly situated.

140.  Even after being put on notice of the accessibility violations, Defendants, MIAMI PROPERTY and CHARTER REALTY refused to make reasonable modifications and remove architectural barriers to allow wheelchair users to have equal access to the Subject Apartments premises.

141.  As a result of the Defendants' actions, Plaintiff, HOPE, has suffered and continues to suffer interference with its mission, diversion of its resources, and obstruction of its purpose of ensuring equal housing opportunities throughout South Florida free from discrimination. Plaintiff HOPE has been, and continues to be adversely affected and has suffered damages due to the discriminatory acts, policies, and practices of the Defendants and/or their agents.

WHEREFORE, Plaintiffs, HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC., PAMELA CARTER, CARLOS QUINONES, VANESSA CANO BERTHENIA MANNINGS, individually and as parent of K.M., GRACIELA CISNEROS, and JULIAN MITCHELL respectfully prays that this Court grants the following relief against Defendants, including entering a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' practices, policies and procedures have subjected Plaintiffs to discrimination in violation of Section 504 of the Rehabilitation Act of 1973  and permanently enjoining the Defendants:

      i.   To cease discrimination against Plaintiffs and other individuals with disabilities.

j.  To ensure and create at least 5% units that are accessible for persons with disabilities;

k.  To ensure and modify all existing facilities to ensure that such facilities are fully usable by persons with disabilities;

l.  To ensure that all current residents are surveyed to determine each resident's accessibility needs;

m.  To ensure that policies exist to ensure that persons with disabilities receive reasonable accommodations and that residents have knowledge of such policies;

n.  To ensure that a management company is retained who can adequately and expeditiously respond to tenant's request without additional burdens;

o.  Award actual damages to plaintiffs;

p.  Award reasonable costs and attorneys' fees; and

q.  Award any and all other relief that may be necessary and appropriate.

## COUNT II- SEX BASED DISCRIMINATION and VIOLENCE AGAINST WOMEN ACT

142.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 122 above as though fully set forth herein.

143.  Defendants, MIAMI PROPERTY, and CHARTER REALTY, have violated the Fair Housing Act, 42 U.S.C. §3601, *et seq.* by discriminating against persons on the basis of sex in connection with the rental of housing at the Subject Apartments. As well as a violation of the dictates of the Violence Against Women Act, 42 U.S.C. § 13981, *et seq.*

144.  Defendants, MIAMI PROPERTY, and CHARTER REALTY, promulgated and enforced a rule related to conduct which adversely affect tenants or residents involved in a domestic violence situation, including the following:

12. IF THE POLICE ARE CALLED TO THE PROPERTY BECAUSE OF ANY TYPE
OF DISTURBANCE OR VIOLATION, THE RESIDENT(S) INVOLVED- DIRECTLY~
OR AS THE HOST OF AN OFFENDING GUEST·· MAY RECEIVE A THIRTY (30)
DAY WRITTEN NOTICE OF LEASE TERMINATION.

*See* Exhibit A attached hereto. P. 9, No. 12.

145. Females are disproportionately more likely than males to be victims of domestic
violence. The rules adversely discriminate against victims of domestic violence, which
historically applies to women.  As such, this provision presents:

    a.  a denial of housing or making housing unavailable because of sex, in violation of
Section 804(a) of the Fair Housing Act, 42 U.S.C. § 3604(a);

    b.  discrimination in the terms, conditions, or privileges of the rental of dwellings, or
in the provision of services or facilities in connection therewith because of sex, in
violation of Section 804(b) of the Fair Housing Act, 42 U.S.C. § 3604(b); and

    c.  the making of statements with respect to the rental of dwellings that indicate a
preference, limitation, or discrimination based on sex, in violation of Section 804(c)
of the Fair Housing Act, 42 U.S.C. § 3604(c).

146.  The Defendants failed to provide notices explaining the VAWA protections and the lease
addendums providing for the protections of victims of domestic violence.

147.  Defendants' discriminatory actions based upon sex have frustrated Plaintiff, HOPE's
goal of promoting equality, nullified Plaintiff, HOPE's numerous educational programs
and have forced Plaintiff, HOPE, to continue funding educational programs that would not
have been necessary in the absence of Defendants' discriminatory actions.

148.  Defendants' actions described above constitute a pattern, practice, and policy of housing
discrimination on the basis of sex and were in total and reckless disregard of Plaintiffs'
rights.

149.  As a result of the Defendants' actions, Plaintiff, HOPE, has suffered and continues to suffer interference with its mission, diversion of its resources, and obstruction of its purpose of ensuring equal housing opportunities throughout South Florida free from discrimination. Plaintiff HOPE has been, and continues to be adversely affected and has suffered damages due to the discriminatory acts, policies, and practices of the Defendants and/or their agents.

WHEREFORE, Plaintiffs, HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC., respectfully prays that this Court permanently enjoin the enforcement of such rule that forces a victim of domestic violence to vacate their home on the basis of violence done to them, damages, and its attorney's fees and costs, and such further relief as this Court deems just and equitable.

## COUNT III- FAMILIAL STATUS DISCRIMINATION

150.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 122 above as though fully set forth herein.

151.  Defendants, MIAMI PROPERTY, CHARTER REALTY and GOPAUL, have violated the Fair Housing Act, 42 U.S.C. §3601, *et seq.* by discriminating against persons on the basis of familial status in connection with the rental of housing at the Subject Apartments.

152.  The foregoing conduct of Defendants, MIAMI PROPERTY, CHARTER REALTY and GOPAUL, constitutes discrimination in the terms, conditions, or privileges of the rental of dwellings, or in the provision of services or facilities in connection therewith because of familial status, in violation of Section 804(b) of the Fair Housing Act, 42 U.S.C. § 3604(b).

153.  Defendants' have discriminated, and continue to discriminate, in the terms, conditions, and privileges of sale or rental and in the provision of services or facilities based on familial

status, by implementing policies and procedures that demonstrate a discriminatory animus towards children and families with children.  Such policies include the following:

154.   The Revised House Rules include rules specifically related to conduct which restrict the equal use and enjoyment of families with children and demonstrate a discriminatory animus against families with children, including the following:

d.   The rules include a curfew provision which states, "Curfew is dark or 9:00pm. All persons under age 18 must be in their apartment by that time. There will be no exceptions to this policy." Miami-Dade does not have a curfew of this nature and restricts the use and enjoyment of families with children.

e.   The rules also restrict residents and/or their guests from playing, loitering or biking in the parking lots, laundry facilities, interior common areas and/or walkways and prohibit the use of skateboards, bicycles, motorized or other vehicles on the sidewalks, hallways, and other common areas of the subject properties.

f.   The rules provide that "Residents' personal items, including toys, playthings, or sports equipment, may not be left unattended," a provision the complainant asserts demonstrates animus against families with children.

g.   In addition, the swimming pool located on the subject property and behind two gates inside the gated facility, is available for use only during management office hours (Monday through Friday, 9:00am to 5:00pm), during which time children are in school. The complainant asserts that this policy adversely affects the ability of school-aged children to use and enjoy the swimming pool after school and on weekends.

     h.  Children under 18 are not permitted in the playground area unattended by a guardian.

     i.  Families with children are not permitted to use the pavilions for birthday parties or other events.

     j.  Such rules are actively enforced by uniformed security guards hired by the management company.

155.  As a result of Defendants' discriminatory actions described above, families with children are deprived of the right to equal housing opportunities regardless of familial status at Subject Apartments.

156.  Defendants' discriminatory actions based upon familial status have frustrated Plaintiff, HOPE's goal of promoting equality, nullified Plaintiff, HOPE's numerous educational programs and have forced Plaintiff, HOPE, to continue funding educational programs that would not have been necessary in the absence of Defendants' discriminatory actions.

157.  Defendants' actions described above constitute a pattern, practice, and policy of housing discrimination on the basis of familial status and were in total and reckless disregard of Plaintiffs' rights.

158.  The Plaintiffs have suffered damages through the loss of enjoyment of the facilities for their children and grandchildren.

159.  As a result of the Defendants' actions, Plaintiff, HOPE, has suffered and continues to suffer interference with its mission, diversion of its resources, and obstruction of its purpose of ensuring equal housing opportunities throughout South Florida free from discrimination. Plaintiff HOPE has been, and continues to be adversely affected and has

suffered damages due to the acts, policies, and practices of the Defendants and/or their agents.

WHEREFORE, Plaintiffs, HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC., PAMELA CARTER, BERTHENIA MANNINGS, individually and as parent of K.M., and GRACIELA CISNEROS respectfully prays that this Court grants the following relief against Defendants, including entering a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, and permanently enjoining that the Defendants from discriminating against families with children, including, but not limited to, enjoining the curfew, enjoining the prohibitions against children under 18 being allowed in the playground alone, allowing children to use the swimming pools during weekends and after school, and having birthday parties and other kids events in the pavilions  and any and all other rules that are not identical to the county or city prohibitions.  Plaintiffs further pray for appropriate damages and attorney's fees, and such further relief as this Court deems just and equitable.

## COUNT IV- FAILURE TO PROVIDE REASONABLE ACCOMMODATIONS OR MODIFICATIONS

160.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 159 above as though fully set forth herein.

161.  Discrimination is defined as the refusal to make reasonable accommodations in rules, policies, practices or services, when such accommodations may be necessary to afford a person with a disability equal opportunity to use and enjoy a dwelling, including public or common use areas. 42 U.S.C. § 3604(f).

162.  Plaintiffs QUINONES, CANO, MANNINGS, CARTER, CISNEROS and HOPE, are either individuals with disabilities or associated with individuals with disabilities.

163.   Defendants MIAMI PROPERTY, CHARTER REALTY and GOPAUL failed and continue to fail to operate their existing housing programs in a manner that does not discriminate on the basis of disability, and failed to take any steps to ensure that existing housing programs are readily accessible to and usable by persons with disabilities.

164.   Defendants MIAMI PROPERTY, CHARTER REALTY and GOPAUL failed to provide and continues to fail to timely provide reasonable accommodations which may be necessary for a person with a disability to use or participate in the program, service or activity.

165.   There are no accommodations that could be provided that would be an undue financial and administrative burden to Defendants MIAMI PROPERTY and CHARTER REALTY or a fundamental alteration in the nature of the programs of the Subject Apartments.  This includes, but is not limited to:

k.   Requiring a release for medical records or other burdensome evaluations as a condition to request an accommodation;

l.   Requiring a resident to re-apply for an accommodation that has previously been provided;

m.   Requiring a resident to provide a release medical information when no request is made;

n.   Placing onerous conditions on the receipt of an accommodation;

o.   Requiring a written agreement to receive an accommodation that limits the use or rights under law;

166. Defendants MIAMI PROPERTY, CHARTER REALTY and GOPAUL failed and continue to fail to pay for a reasonable accommodations needed by its tenants.  This includes but is not limited to

  p.  Providing and paying for grab bars or accessible toilet seats.

  q.  Providing and paying for accessible ramps from units,

  r.  Providing and paying for designated parking spaces for persons with disabilities.

167.  Defendants MIAMI PROPERTY, CHARTER REALTY and GOPAUL' were personally involved in, and/or authorized or ratified each and every discriminatory act and denial of accommodations for Plaintiffs, QUINONES, CANO, MANNINGS, CARTER, CISNEROS and HOPE herein.

168. Further, as a direct and proximate result of Defendants refusal to accommodate QUINONES, CANO, MANNINGS, CISNEROS, and CARTER, and  continued inquiry in to their disability, QUINONES, CANO, MANNINGS, CARTER, and CISNEROS have suffered irreparable loss and injury including but not limited to actual damages, humiliation, emotional distress, and deprivation of her right to equal housing opportunities regardless of disability.

169.  As a result of the Defendants' actions, Plaintiff, HOPE, has suffered and continues to suffer interference with its mission, diversion of its resources, and obstruction of its purpose of ensuring equal housing opportunities throughout South Florida free from discrimination. Plaintiff HOPE has been, and continues to be adversely affected and has suffered damages due to the acts, policies, and practices of the Defendants and/or their agents.

WHEREFORE, Plaintiffs, HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC., PAMELA CARTER, CARLOS QUINONES, VANESSA CANO, BERTHENIA MANNINGS, individually and as parent of K.M., and GRACIELA CISNEROS, respectfully pray that this Court grants the following relief against Defendants, including entering a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' practices, policies and procedures have subjected Plaintiffs to discrimination in violation of the Fair Housing Amendments Act and permanently enjoining the Defendants:

a. To cease discrimination against Plaintiffs and other individuals with disabilities.

b. To ensure that all current residents are surveyed to determine each resident's accessibility needs;

c. To ensure that policies exist to ensure that persons with disabilities receive reasonable accommodations and that residents have knowledge of such policies;

d. To ensure that a management company is retained who can adequately and expeditiously respond to tenant's request without additional burdens;

e. Award actual and punitive damages to plaintiffs;

f. Award reasonable costs and attorneys' fees; and

g. Award any and all other relief that may be necessary and appropriate.

**COUNT V- DISCRIMINATORY PUBLICATIONS 42 U.S.C. § 3604(c)**

170. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 169 above as though fully set forth herein.

171. By printing and promulgating discriminatory rules and regulations violate 42 U.S.C. § 3604(c) "To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates

any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.."

172. Defendants, MIAMI PROPERTY, and CHARTER REALTY were personally involved in, authorized and enforced discriminatory publications that limited the use and enjoyment of the premises to families with children, excluded victims of domestic violence from housing, and limited the rights of persons with disabilities to request accommodations for their disability.

173. The seminal document of intent was the  Defendants' "Fair Housing Statement" which expressly discouraged accommodations or modifications under the Fair Housing Act:

> **Management staff at your community has a legal obligation to treat each individual in a consistent manner. Please do not put them in the difficult position of denying a request for an exception to the written policy.**

See Exhibit "B".

174. By printing and promulgating discriminatory rules and regulations, and posting signs which limit the use and enjoyment of the premises, the Defendants violated the Act by restricting or attempt to restrict the choices of a person by word or conduct in connection with seeking or renting a dwelling so as to perpetuate, or tend to perpetuate, segregated housing patterns, or to discourage or obstruct choices in a community, neighborhood or development.

175. Defendants' actions were in total and reckless disregard of Plaintiffs' rights.

176. As a result of the Defendants' actions, Plaintiff, HOPE, has suffered and continues to suffer interference with its mission, diversion of its resources, and obstruction of its purpose of ensuring equal housing opportunities throughout South Florida free from

discrimination. Plaintiff HOPE has been, and continues to be adversely affected and has suffered damages due to the acts, policies, and practices of the Defendants and/or their agents.

WHEREFORE, Plaintiffs, HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC., demand judgment against MIAMI PROPERTY GROUP, LTD., and CHARTER REALTY GROUP, INC., to declare that the actions of the Defendants violated the Fair Housing Amendments Act, and award the following:

a. That the Court declare that the actions of the Defendants violated the Fair Housing Amendments Act by publishing materials which discriminate against persons with disabilities;

b. That the Court declare that the actions of the Defendants violated the Fair Housing Amendments Act by publishing materials which discriminate against persons based on familial status;

c. That the Court declare that the actions of the Defendants violated the Fair Housing Amendments Act by publishing materials which discriminate against persons based on gender;

d. That the Court order Defendants to provide a notice to all residents and tenants at the Subject Apartments of their rights under the Fair Housing Act,

e. Appropriate actual and punitive damages for the plaintiffs and their attorney's fees and costs.

f. And grant any other such relief as this Court deems just and equitable.

## COUNT VI- RETALIATION

177.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 176 above as though fully set forth herein.

178.  Defendants MIAMI PROPERTY, CHARTER REALTY and PAULETTE GOPAUL, were personally involved in and/or had authorized or ratified each and every discriminatory act described herein.

179.  Shortly after HOPE and residents of the Subject Apartments filed fair housing complaints with the U.S. Department of Housing & Urban Development ("HUD"),   Plaintiffs were advised that residents who are a party to HUD complaints would not be allowed to participate in a dialogue with management or be a representative of the Tenant Council.

180.  Defendants publish materials that are solely used to intimidate and interfere with a person's rights under the Fair Housing Act, such as:

    a.  Asking if a doctor would be willing to testify in Court regarding his opinion relating to disability;

    b.  Implying that it is a misdemeanor subject to substantial fines and punishment for misrepresentations of the request form;

181.  Section 3617 of the Fair Housing Act makes it unlawful to: "coerce, intimidate, threaten, or interfere with any person ... on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section ... 3604 of this title."

182.  Section 3617 has been broadly applied to reach *all practices* which have the effect of interfering with the exercise of rights under the federal fair housing laws."

183.  Such actions of defendants were for the purpose of coercing, intimidating, threatening, or interfering with the residents' exercise of their fair housing rights.

WHEREFORE, Plaintiffs, PAMELA CARTER, CARLOS QUINONES, VANESSA CANO, BERTHENIA MANNINGS, individually and as parent of K.M., GRACIELA CISNEROS, and JULIAN MITCHELL, and demand judgment against MIAMI PROPERTY GROUP, LTD., CHARTER REALTY GROUP, INC. and PAULETTE GOPAUL to declare that the actions of the Defendants violated the Fair Housing Amendments Act, by retaliating against Plaintiffs for asserting their rights under the fair housing act and award Plaintiffs compensatory and punitive damages, and their attorneys' fees and costs as well as any other such injunctive relief as this Court deems just and equitable.

## COUNT VII – NEGLIGENCE

184. Plaintiff CARTER repeats and realleges the allegations contained in paragraphs 1 through 183 above as though fully set forth herein.

185. Plaintiff CARTER made numerous requests for bathroom grab-bars so she could safely use the toilet in her apartment.

186. Defendant MIAMI PROPERTY GROUP, LTD., CHARTER REALTY GROUP, INC., had knowledge of CARTER's disability, and use of a walker for mobility.

187. MIAMI PROPERTY GROUP, LTD. and CHARTER REALTY GROUP, INC. knew and installed grab bars in CARTER's bathroom because of her need for grab-bars to be safe and not fall in the bathtub.

188. Further, MIAMI PROPERTY GROUP, LTD., CHARTER REALTY GROUP, INC. through their authorized representative and property manager, PAULETTE GOPAUL knew that Ms. CARTER was obese and any accommodation required additional support.

189. MIAMI PROPERTY GROUP, LTD. and CHARTER REALTY GROUP, INC. has a legal duty to pay for and install the required grab bars by the toilet in Ms. CARTER's apartment as an accommodation for her disability and to ensure her safety.

190. MIAMI PROPERTY GROUP, LTD., CHARTER REALTY GROUP, INC. failed to provide or pay for the grab bars in Ms. CARTER's apartment because of their practice of requiring a resident's insurance company to pay for the accommodation and then they would install the grab bar.

191. There are many different types of reinforced toilet grab bars that could accommodate an obese person, such as floor mounted grab bars, or grab bars that are permanently fixed to the ground and the wall.

192. MIAMI PROPERTY GROUP, LTD., and CHARTER REALTY GROUP, INC. intentionally and deliberately failed to install the grab bars for Ms. CARTER, and as a result thereof, Ms. CARTER used the knob of her bathroom door to assist her with standing and sitting on the toilet.

193. Nine months after the initial request, the door knob failed and Ms. CARTER fell in her bathroom and suffered severe and permanent injury as a result of her fall.

194. MIAMI PROPERTY GROUP, LTD. and CHARTER REALTY GROUP, INC. breached their duty to care for Ms. CARTER, and as a result of the breach of duty, Ms. CARTER suffered damages.

195. MIAMI PROPERTY GROUP, LTD. and CHARTER REALTY GROUP, INC.'S behavior was reckless and the harm to Ms. CARTER was obvious.

WHEREFORE Plaintiff PAMELA CARTER, demand judgment against MIAMI PROPERTY GROUP, LTD. and CHARTER REALTY GROUP, INC. demands compensatory damages,

HOPE, INC. v. MIAMI PROPERTY GROUP, LTD.
Page 46 of 46

punitive damages, pre-and post-judgment interest as well as any other such relief as this Court

deems just and equitable.

THE PLAINTIFF DEMANDS A JURY TRIAL FOR ALL ISSUES SO TRIABLE.

Dated this 10th day of June, 2014.


DISABILITY INDEPENDENCE GROUP, INC.
2990 Southwest 35th Avenue
Miami, Florida 33133
Telephone: (305) 669-2822
Facsimile: (305) 442-4181
E-Mail: mdietz@justdigit.org

By:      /s/ Matthew W. Dietz
         Matthew W. Dietz, Esq.
         Florida Bar No.: 0084905