IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI-DADE DIVISION

CASE NO.:

HOUSING OPPORTUNITIES PROJECT
FOR EXCELLENCE, INC., PAMELA CARTER,
CARLOS QUINONES, VANESSA CANO,
BERTHENIA MANNINGS, individually and as parent
of K.M., GRACIELA CISNEROS, and JULIAN
MITCHELL

      Plaintiffs

vs.

MIAMI PROPERTY GROUP, LTD., CHARTER
 REALTY GROUP, INC., and PAULETTE
GOPAUL

      Defendants
_____/

**MOTION FOR PRELIMINARY INJUNCTION**

COMES NOW, the Plaintiffs, HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC., PAMELA CARTER, CARLOS QUINONES, VANESSA CANO, BERTHENIA MANNINGS, individually and as parent of K.M., GRACIELA CISNEROS, and JULIAN MITCHELL and pursuant to Rule 65, Federal Rules of Civil Procedure, hereby moves to enjoin the Defendants, MIAMI PROPERTY GROUP, LTD., CHARTER REALTY GROUP, INC., and PAULETTE GOPAUL, from discriminating against persons based on disability, and familial status in housing, and states as follows:

**I.     INTRODUCTION**

The Defendants herein, MIAMI PROPERTY GROUP, LTD., CHARTER REALTY GROUP, INC., and PAULETTE GOPAUL, own, operate, and manage three apartment complexes, two in Miami Gardens and one in Opa Locka, (hereinafter collectively referred to as "the Subject Apartments") whose tenants receive project-based rental assistance from the Department of Housing and Urban Development ("HUD"). As recipients of such HUD financial

assistance, under Section 504 of the Rehabilitation Act of 1973, the defendants have an obligation to affirmatively remove architectural barriers and provide accommodations to these tenants – as well as pay the costs for those modifications.  In addition, these Defendants have the same obligations under the Federal Fair Housing Act as any other owner or manager of rental housing not to discriminate in the rental or programs, services, privileges and accommodations of such housing based upon disability, or familial status.

Over the past year, HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC., (hereinafter "HOPE"), Fair Housing Organization for Miami-Dade and Broward has been attempting to advocate for the residents of these apartments and has repeatedly failed and thereafter filed a claim with the Department of Housing and Urban Development, where such claim has been pending.  However, tenants are now being physically injured by the failure of these Defendants to comply with their lawful obligations, and the Plaintiffs demand immediate intervention by this Court.

While the Complaint covers the systemic violations, such as the failure to comply with the design and construction requirements of Section 504 of the Rehabilitation Act throughout the three facilities and damages for the past acts of discrimination, the preliminary injunction covers what is needed for immediate intervention:

1. Replace the management of the Subject Apartments with an entity that is familiar with the requirements of the Fair Housing Act and the Rehabilitation Act of 1973;

2. Conduct a survey of residents of the Subject Apartments with disabilities and inquire what modifications are required in their homes, which may include:

   a. Ramps to get in and out of a residence;

   b. Grab bars at toilets or bathtubs;

   c. Widening of doors;

   d. Levers at doors, instead of knobs;

   e. Designated assigned parking places;

   f. Switches and sockets within reach range;

   g. Assignments to first floor units, when available.

3. Have all such modifications completed within sixty days.

4. Deem the following rules as unenforceable:

   a. Curfew for children; and

    b.  Children not being permitted to use the playground unless they are supervised by someone who is 18 years old

5.  Allow access to the swimming pool during at times other than business hours, and allow tenants to use the pavilions for activities.

6.  Prohibit inquiries on the nature and extent of a disability, especially where no accommodations are requested.

## II.    FACTS

This is an action initiated for the denial of federally secured rights under the Fair Housing Act, Section VIII of the Civil Rights Act of 1964, as amended; and Section 504 of the Rehabilitation Act of 1973. The Defendants, MIAMI PROPERTY GROUP, LTD., CHARTER REALTY GROUP, INC., own and operate three, project-based, Section 8 rental properties with 507 units in total –

a. 183rd Street Apartments, located at 18451 NW 37th Avenue, Miami Gardens, Florida 33056 (hereinafter referred to as "183rd St. Apts."),

b.  187th Street Apartments, located at 18665 NW 37th Avenue, Miami Gardens, Florida 33056 (hereinafter referred to as "187th St. Apts.")

c. 22nd Avenue Apartments, located at 13875 NW 22nd Avenue, Opa Locka, FL 33054 (hereinafter "22nd Ave. Apts.")

(collectively referred to as "the Subject Apartments"). For each of these units, these Defendants charge a market rate rent. The tenants are required to pay a defined percentage of their income, and the Department of Housing and Urban Development provides payment for the remainder of the monthly rent. The occupancy for such units is approximately 99% occupied.

According to the most recent statistics maintained publically by the Department of Housing and Urban Development from the Defendants' Tenant Income Certification information, the demographics of the Subject Apartments are as follows:

a.  Total number of residents in the Subject Apartments – 1148

b.  Over 97% of all residents are classified as very low income[1], and over 85% are extremely low income.[2]

---

[1] "Very low-income" is defined as 50 percent of the median family income for the area.
[2] "Extremely low-income" is defined as 30 percent of the median family income for the area.

    c.   Approximately 6% of households have two adults with children, and 47% of the apartments have one adult with children.

    d.   At least 10% of all residents have one or more disabilities.

    e.   The Subject Apartments are 99% minority occupied, the majority of which are Black.

After being contacted by several residents of the Subject Apartments and noting various *per se* discriminatory housing practices in the rules and regulations, HOPE employees visited the property and expended its scarce resources on many different occasions. During these visits, HOPE employees met with residents in small groups and individually regarding their complaints in all areas of housing discrimination, and along with such residents, drafted a Fair Housing Complaint to submit to HUD.

On July 23 2013, HOPE, filed a Fair Housing Complaint with the U.S. Department of Housing and Urban Development regarding the unlawful rules and regulations.  The complaint contained thirty different complainants who are residents of the Subject Apartments. [D.E. 1-7]. Additional complaints have been filed since the July 23, 2013 filing. Since the filing of the complaint, MIAMI PROPERTY and CHARTER REALTY have continued to enforce the unlawful polices and have discriminated against the residents of the Subject Apartments.

On May 20, 2013, CHARTER REALTY distributed "Revised House Rules" to residents of the Subject Apartments with an attached cover letter dated May 20, 2013 and several attachments, which advised residents such rules would go into effect in thirty (30) days. *See* Revised House Rules dated May 2013 attached hereto as Exhibit "A".

In such document, the Defendants included a "Fair Housing Statement" which expressly discouraged accommodations or modifications under the Fair Housing Act:

> **Management staff at your community has a legal obligation to treat each individual in a consistent manner. Please do not put them in the difficult position of denying a request for an exception to the written policy.**

*See* House Rules- Lease Attachment #3 attached hereto as Exhibit "B".

### A.  DISCRIMINATORY POLICIES BASED UPON DISABILITY

When a resident notifies the defendants that he or she has a disability, the Defendants policy, whether or not a request for accommodation is made, requires such person to sign a

"Handicapped/Disabled Verification" Fform, attached hereto as Exhibit "C". The "Handicapped/Disabled Verification" Form requires the resident to disclose any information requested from the doctor from CHARTER REALTY and sign an authorization stating:

> "I hereby authorize the release of any information requested regarding my handicapped/disabled status in order to determine whether Or[sic] not I meet the following criteria for purposes of eligibility."

There is only an income eligibility for the Subject Apartments and there are no criteria for eligibility for residency based on disability status, and such inquiry and invasive request for information is without any legitimate purpose.   In addition to signing a release for all medical information, when a tenant makes a request for an assistance animal as an accommodation, the applicant is required to fill out a packet of requests, rules and medical authorizations, attached as Exhibit "D".   The authorization allows the Defendants to contact the applicant or resident's healthcare provider.   Further, if any modification is requested, the questionnaire by the medical professional and the resident must be sworn under penalty of perjury and advises that providing false information is a misdemeanor, and places the following warning on the forms:

**Penalties for misuse of the application or verification form**

> Title 18, Section 1001 of the U.S. Code states that a person is guilty of a felony for knowingly and willingly making false or fraudulent statements to any department of the United States Government.  HUD, the PHA and any owner (or any employee of HUD the PHA or the owner) may be subject to penalties for unauthorized disclosures or improper uses of information collected based on the consent form.  Use of the information collected based on this verification form is restricted to the purposes cited above.   Any person who knowingly or willfully requests, obtains or discloses any information under false pretenses concerning an applicant or participant may be subject to a misdemeanor and fined not more than $5,000. Any applicant or participant affected by a negligent disclosure of information may being civil action for damages, and seek other relief, as may be appropriate, against the officer of employee of HUD, the PHA or the owner responsible for the unauthorized disclosure or improper use. Penalty provisions for misusing the social security number are contained in the Social Security Act at 208(a)(6), (7) and (8).  Violation of these provisions are cited as violations of 42 U.S.C. 4098(a)(6), (7), and (8).

Such provision has no applicability to the doctor or resident, and is solely used to intimidate or interfere with the resident's right to have an accommodation. Further, the information being

required is not for submission to U.S. HUD. The accommodation request is going to the housing provider directly.

Even with other reasonable accommodations and modification, as a condition to receiving the accommodation and/or modification, defendants require the tenant to enter into an "Agreement" that limits the resident's rights under Section 504 or the Fair Housing Act.

Further the Revised House Rules include rules specifically related to conduct which restrict the equal use and enjoyment of families with children and demonstrate a discriminatory animus against families with children, including the following:

a.  The rules include a curfew provision which states, "Curfew is dark or 9:00pm. All persons under age 18 must be in their apartment by that time. There will be no exceptions to this policy." Miami-Dade does not have a curfew of this nature and restricts the use and enjoyment of families with children.

b.  The rules also restrict residents and/or their guests from playing, loitering or biking in the parking lots, laundry facilities, interior common areas and/or walkways and prohibit the use of skateboards, bicycles, motorized or other vehicles on the sidewalks, hallways, and other common areas of the subject properties.

c.  The rules provide that "Residents' personal items, including toys, playthings, or sports equipment, may not be left unattended," a provision the complainant asserts demonstrates animus against families with children.

d.  In addition, the swimming pool located on the subject property and behind two gates inside the gated facility, is available for use only during management office hours (Monday through Friday, 9:00am to 5:00pm), during which time children are in school. The complainant asserts that this policy adversely affects the ability of school-aged children to use and enjoy the swimming pool after school and on weekends.

e.  Children under 18 are not permitted in the playground area unattended by a guardian.

f.  Families with children are not permitted to use the pavilions for birthday parties or other events;

g.  Such rules are actively enforced by uniformed security guards hired by the management company.

h.  CHARTER REALTY fails to maintain the playground area, nor is there a designated area for children to play and ride bicycles.

At least ten percent of the apartments has persons are persons who have disabilities. Since its investigation, HOPE has assisted tenants (and now Plaintiffs) who have disabilities attempt to obtain accommodations.  As demonstrated above, accommodations are not easily requested or provided.

## B. DEFENDANTS ARE NOT AWARE OF THEIR SIMPLE OBLIGATION TO PROVIDE RAMPS AND GRAB BARS

Notwithstanding the fact that these defendants have been operating the subject apartments for several years, they are befuddled and continue to be befuddled by the most ordinary of requests for accommodations, a ramp and bathroom grab bars.  Most of the apartments at the Subject Apartments have a step into the unit, which is approximately six inches high.  Some of the apartments at the 22nd Ave. Apts. have a ramp into the apartment that is at a slope of approximately 25% steep (approximately a 22 degree angle).

### a.  PAMELA CARTER[3]

PAMELA CARTER lives at the 183rd Street Apts. with her son and her three grandchildren, ages five, seven and nine.  She lives with multiple disabilities that manifest themselves in a readily apparent mobility impairment. As such, she uses a walker to assist her with mobility.  There is a step into Ms. CARTER's apartment that she has difficulty navigating due to her mobility impairment, and she has difficulty using the bathroom facilities and bathtub. Further, due to the physical inaccessibility of the development, her use and enjoyment of the premises is limited.  For example, Ms. CARTER cannot watch her grandchildren play in the playground as there is no access to the playground for a person with mobility impairments.

Prior to her contact with HOPE, Ms. CARTER was not aware of the obligations of the Defendants to make her apartment or common areas readily accessible and usable by individuals with disabilities.   On August 7, 2013, Keenya Robertson of HOPE, wrote a letter on behalf of Ms. CARTER to CHARTER REALTY explicitly advising the Defendant of Ms. CARTER's obvious disability and making a request for grab-bars in her bathroom and a ramp at the entrance of her unit under both Section 504 and the Fair Housing Act.  The attorney for Charter Realty and Miami Property Group, Ms. Sherri Rockwell promised to install grab bars within ten days

---

[3] See the Declaration of Pamela Carter filed contemporaneously with this motion.
Disability Independence Group, Inc, 2990 Southwest 35th Avenue, Miami, Florida 33133

and begin to research how to install a ramp, but promised to respond with two weeks.  Ms. Rockwell acknowledged the issues Ms. Robertson had with the house rules as stated above, and maintained that HUD was reviewing the rules.

On September 26, 2013, Property Manager PAULETTE GOPAUL sent correspondence to Ms. CARTER confirming that their grab bars were installed the week prior to September 26, 2013, but they needed more time to evaluate the design of a ramp allowing them access into and out of her home. Nevertheless, Charter Realty only installed grab bars by the bathtub/shower area, and not the toilet area.

Charter Realty suggested that it install a portable ramp; but Ms. Robertson advised Charter Realty that a temporary (portable) ramp would not be an adequate solution to providing Ms. CARTER ingress and egress out of her home as it would be a dangerous option for Ms. CARTER.  Further, Ms. Robertson re-affirmed that the grab bar request included both bath tub **and** toilet grab bars.  At the time, Ms. Robertson provided Charter Realty with a sketch of a ramp that would allow Ms. CARTER full and independent ingress and egress out of her home. The sketch was drafted by HOPE employee Danny Howe, who was previously the Americans with Disabilities Act ("ADA") Coordinator for Miami-Dade Housing Authority.

On October 14, 2013, Ms. Rockwell advised Ms. Robertson that, despite the request that was made in August, Ms. CARTER did not want a ramp and only wanted a grab bar at the exterior of the unit.  Further, Ms. Rockwell erroneously asserted that the suggested ramp out of Ms. CARTER's unit would be "not feasible or practical".  In addition, Ms. Rockwell stated that in their experience in property management, a request for bathroom grab bars does not include toilet-area bars, and as such, Defendants not provide Ms. CARTER a toilet grab bar.  Further, Ms. Rockwell suggested that Ms. CARTER's health insurer provide her with grab bars and a raised toilet seat, and management would install such devices as was commonly done in the past. Ms. Rockwell was upset at Ms. Robertson for suggesting that it was Charter Realty's responsibility to provide such accommodations.  Ms. Rockwell concluded the October 14, 2013 correspondence by stating, "…Ms. Carter does not want **or need** a ramp at this point, so any further ramp-related discussion is moot."

On October 15, 2013, Keenya Robertson, on behalf of Ms. CARTER disagreed with Ms. Rockwell's account and advised that Ms. CARTER's request for a ramp had not been withdrawn and again demanded a ramp at the entrance of her unit.  Further, Ms. Robertson clarified that Ms.

CARTER did not want a mobile or portable ramp as such accommodation would not be safe. Further, Ms. Robertson demanded that the ramp was presently imperative for her mobility impairment.  Notwithstanding HOPE's letter, on October 23, 2013, Sheri Rockwell sent a letter to Ms. Robertson requesting Ms. CARTER's weight and the model wheelchair that Ms. CARTER expects to obtain.

In February 2014, Ms. CARTER's daughter passed away after having a long fight with lung disease. On February 26, 2014, while mourning, Defendant GOPAUL bypassed Ms. Robertson (and HUD) and requested that Ms. CARTER provide information about her weight before installing any device for her. Ms. CARTER does not know her weight and has not been weighed by a doctor, but her weight visibly exceeds 300 pounds.  However, such inquiries were not made when the grab bars mounted to the bathtub were installed.  In addition, there are several types of grab-bars in which weight is less of an issue, such as floor-mounted grab bars or fixed grab bars that are attached to the floor and the wall.  Despite the fact that the accommodations were handled by HOPE, HOPE was not sent the letter from GOPAUL.  No grab bars were installed in the bathroom, and Ms. CARTER continued to use the door knob to assist her in standing and sitting onto the toilet.

On April 23, 2014, Ms. Gopaul sent a letter to Mrs. CARTER following up on the status of the wheelchair as a new condition to get a ramp, stating:

> Almost eight (8) months have passed, and I have not yet seen you with a wheelchair.  In our many conversations since then, you've not mentioned that you have yet obtained a wheelchair or that you would be getting one anytime soon.  Also, when I've gone to your unit, I've not seen a chair. The purpose of this letter is to clarify your plans to obtain a wheelchair before we can proceed to make plans for a ramp…. If I don't hear from you, I will assume you no longer plan to obtain a wheelchair and therefore, do not need a ramp installed."

On May 9, 2014, Keenya Robertson, on behalf of Ms. CARTER again reiterated the nine month old accommodation request as such request was needed for a walker.

On  or about May 12, 2014, Ms. Johnnye Lewis, the resident with a mobility disability at the 22nd Ave. Apartments, tripped over a concrete ramp with an over 25% slope and became severely injured as a result of her fall.   Just four months previously, on February 18, 2014, Keenya Robertson of HOPE filed of a Housing Discrimination Complaint against Defendants alleging that on August 18, 2013, Ms. Lewis approached the Defendants expressing that her ramp was too steep and she was concerned she would fall due to its structure. Further, Ms.

Lewis, requested that the ramp be altered so she could in and out of her unit without fear of falling.

As a result of Ms. Lewis' accident, on May 19th, Ms. Rockwell, sent a letter to Ms. Robertson agreeing to allow Ms. CARTER to have a permanent ramp with a design similar to that proposed by Mr. Howe of HOPE in October.   Further, in such letter, Ms. Rockwell misrepresented to Ms. Robertson that a new toilet and grab bars were installed at Ms. CARTER's apartment.  In order to receive the ramp, Ms. Rockwell wanted Ms. CARTER to sign an agreement "Confirmation of Ramp Installation".  No additional toilet grab bars were installed in Ms. CARTER's apartment.

On or about May 19th, Ms. CARTER slipped and fell when she attempted to use the bathroom door knob to stand after using the toilet.  As a result of the fall, Ms. CARTER suffered injury, causing a two week hospitalization and several weeks of planned convalescent time.

Currently, the Defendants **are refusing** to install the ramp unless they receive confirmation from Ms. CARTER's medical providers that she is able to continue to live on the premises and under what condition that this may be possible.  Further, despite the prior assertion that the Ms. CARTER was provided with toilet grab bars, the Defendants again requested weight information. To this day, Ms. Carter does not have toilet grab bars or a ramp out of her home.

### b. CARLOS QUINONES

CARLOS QUINONES[4] is an elderly man who lives alone at the 187th St. Apts.  He has a mobility impairment and uses a motorized wheelchair to ambulate. Mr. QUINONES' disability is open and obvious to Defendant's agents and employees.

Prior to 2013, Mr. QUINONES lived in a two bedroom apartment with an entrance to the apartment onto a passageway that was large enough to accommodate his home-made wooden ramp that he would use for ingress and egress into his apartment.   In 2013, with less than one week notice, Defendants required Mr. QUINONES to move to a one bedroom apartment.  Such apartment had a six inch step into the apartment.   Soon after moving in to his new and smaller apartment, Defendant GOPAUL and a police officer confronted Mr. QUINONES and advised him that his home-made ramp was a hazard and dangerous due to the size of the ramp and lack of space on the sidewalk for such ramp.  He was intimidated by the presence of law enforcement

---

[4] See the Declaration of Carlos Quinones filed contemporaneously with this motion.

during the visit as there had been no inquiry from management regarding the plywood ramp while being used at his previous unit, which was located on a more remote location, while his current unit sits on a main walkway.

Prior to contact with HOPE, Mr. QUINONES was not aware of the obligations of the Defendants to make his apartment or common areas readily accessible and usable by individuals with disabilities.   On August 7, 2013, Keenya Robertson of HOPE, wrote a letter on behalf of Ms. QUINOINES to Charter Realty alerting the Defendant of Mr. QUINONES' obvious disability and making a request for grab-bars in his bathroom and a ramp at the entrance of his unit under both Section 504 and the Fair Housing Act.   On August 16, 2013, Ms. Rockwell promised to install grab bars within ten days and begin to research how to install a ramp, but promised to respond with two weeks.   Ms. Rockwell acknowledged the issues Ms. Robertson had with the house rules and maintained that HUD was reviewing the rules.   On September 26, 2013, Property Manager GOPAUL sent correspondence to Mr. QUINONES confirming that their grab bars were installed the week prior to September 26, 2013, but they needed more time to evaluate the design of a ramp allowing them access into and out of their home.   CHARTER REALTY only installed grab bars by the bathtub/shower area, and not the toilet area.

On or about October 22, 2013, Mr. QUINONES was provided with an agreement for a ramp that was installed at his doorway.   The ramp was a portable, suitcase-style, ramp that cannot be used without assistance.   The slope and weight requirements of the ramp make such use dangerous and infeasible.   Such agreement required him to acknowledge that ramp is to be used to push wheelchair in and out of unit and that no person is to be sitting in wheelchair when using ramp. As a result of attempting to move a wheelchair out of a doorway un-occupied, the wheelchair has fallen and has had to be lifted up.   It presents a constant danger to Mr. QUINONES or others that attempt to assist Mr. QUINONES.

Mr. Quinones would like a permanent ramp that he can use to get in and out of his apartment independently and in his wheelchair.

## C. DEFENDANTS ARE NOT AWARE OF THEIR SIMPLE OBLIGATION TO DESIGNATE A PARKING SPOT

With Mr. Quinones, he should have never been transferred to a unit that he could not use his ramp, and remained at a more accessible unit.  However, with Ms. VANESSA CANO,[5] she

---

[5]  See the Declaration of Vanessa Cano filed contemporaneously with this motion.

was placed in a second floor unit, even though her mobility impairment is obvious, and then could not get (and still cannot get) a designated assigned parking space.

Ms. VANESSA CANO is a young woman who lives alone at the 187th St. Apts. She has an obvious mobility impairment and uses a metal cane to assist her to ambulate. Ms. CANO has lupus and the disease progressed to damage her hip joints.

Notwithstanding her obvious disability, in February 2011, Ms. GOPAUL placed Ms. CANO in a second floor apartment with access only by stairs. At such time, Ms. GOPAUL advised Ms. CANO that she was going to put CANO where she wanted to. CANO had no choice as to where her unit would be. Prior to contact with HOPE, Ms. CANO was not aware of the obligations of the Defendants to adopt suitable means to ensure persons with disabilities are made aware of the availability of accessible units and to maximize use of accessible units by individuals needing the features of these units.

In June of 2013, CANO requested a designated parking space for her to accommodate her disability as the parking lot was beginning to be filled and she could not obtain a parking spot. In response to her inquiry, CANO was advised that the parking lot had all of the disabled parking that it needed. Even though she has a chronic condition and has been obviously disabled since moving to the Subject Apartments, Ms. CANO explained that she needed the space for her hip replacement surgery. CANO requested a parking space again in August 2013, after HOPE inquired into the issue.

An accessible parking space was placed in the parking lot in November 2013. However, the space was not designated for Ms. CANO, and anyone with a handicapped placard parked in the space. As such, the space was not available for Ms. CANO. On December 9, 2013, a confirmation letter was given to VANESSA CANO stating that the reasonable accommodation request for a parking space was temporarily honored. The letter states that management responded to the request within two weeks and was ready before she returned home from her surgical procedure. The letter also confirms that the space meets the needs of VANESSA CANO during her recovery period. The letter speaks for CANO and they had her sign the letter as a condition of her being able to use the space. However, Ms. CANO is not going to recover from Lupus and will always be mobility impaired.

On May 29, 2014, the Defendants added the word "reserved" to the accessible space sign. It now appears that the space is reserved for persons with handicapped placards, and not for Ms. CANO.  She has no expectation that the Defendants are able to designate a space for her use. Even though they added the word "reserved" to the sign, it does not indicate that it is for anyone in particular and continues to be used by others who have a placard in their vehicle.

Ms. CANO would like to have an accessible spot for her use and would like to live in a first floor unit at the 187th St. Apartments so she does not need to walk down a flight of stairs, and would like grab bars in her unit bathroom.

### D.  REQUESTS FOR ADDITIONAL AND IRRELEVANT INFORMATION

BERTHENIA MANNINGS[6] is the mother of a child with a disability that was prescribed a service animal for his autism and GRACIELA CISNEROS[7] is a person with a disability who has an emotional support animal.

In May of 2012, Ms. GRACIELA CISNEROS, a resident of the 22nd Ave. Apts., obtained approval of her emotional support animal from Defendants and has had the assistance animal since that time. After May 20, 2013, pursuant to the new rules, in order to keep her assistance animal, residents would be required to re-initiate, in writing, her need for an assistance animal and otherwise comply with the rules for doing so.  The Rules further specify that the residents' need for an assistance animal must be independently verified with the residents' healthcare provider by management. Further, the Rules note that the residents' failure to comply with these revised policies would result in adverse action including removal of previously approved but now considered "unauthorized assistance animals", with potential for lease violations and eviction proceedings. Ms. CISNEROS was required by management to sign a release that would grant management to contact her health care provider directly and such inquiries include the nature and severity of her disability or handicap.

BERTHENIA MANNINGS lives at the 187th St. Apts.  She is the mother of a fifteen year old son, K.M., as well as the grandmother of two minor children. As a result of his Autism, K.M. is hypersensitive to environmental stimulus, and has extreme social disabilities. As such, his therapist prescribed a service animal as a form of treatment for K.M. Ms. MANNINGS sent a

---

[6] See the Declaration of Berthenia Mannings filed contemporaneously with this motion.
[7] See the Declaration of Graciela Cisneros filed contemporaneously with this motion.

letter from K.M.'s health care provider to the defendants; however, the defendants required a detailed application process to obtain a service animal.  On October 9, 2013, a letter was sent to MANNINGS stating it was the final request for her to complete the application process to see if she is entitled to an assistance animal for her child, who she "contends has autism". The forms needed to be completed by December 13, 2013 at 3:00p.m. On November 4, 2013, GOPAUL sent a letter to MANNINGS stating that an extensive application, including a third party is needed to show proof of needing the requested accommodation is required.  On December 12, 2013, Ms. MANNINGS met HUD manager Vicki Johnson and Ms. Johnson instructed Manning not to complete the application package for service animal requiring release of medical records for independent verification with health care provider by management. Despite the instruction by Ms. Johnson, GOPAUL continued to request such information from Ms. MANNINGS.  Then, on December 27, 2013, Defendants sent correspondence to Ms. MANNINGS permitting the service animal for her son, conditioned upon signing an Assistant Animal Agreement and Assistance Animal Registration Form in order for this accommodation to be allowed. The letter states that signing the agreement and registration document are not optional; even if her son was approved to have an animal, she must still agree to follow certain rules.

Both Ms. MANNINGS and Ms. CISNEROS were discriminated against on the basis of disability and denied the privileges and use of the facility based on disability because of such rules that are unduly invasive and discourage the provider and the resident from obtaining a service animal and then condition the accommodation upon signing an Assistant Animal Agreement and Assistance Animal Registration Form in order for this accommodation to be allowed.

### E.  REQUESTS FOR MEDICAL INFORMATION WITH NO REASON

JULIAN MITCHELL[8] is a man who has a disability, receives social security disability and lives at the 22nd Ave. Apts. On January 28, 2014, Mr. Mitchell was required to sign a form release of medical records and independent verification of benefits, even though he did not request an accommodation or modification.  He does not want to unnecessarily disclose his medical information without any need or purpose.

### III.   MEMORANDUM OF LAW

---

[8] See the Declaration of Julian Mitchell filed contemporaneously with this motion.

Under the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, as amended, Congress found that it was a national priority to ensure that all persons have an equal right to obtain housing with the same terms and conditions notwithstanding their race, color, religion, national origin, sex, disability, or familial status. For recipients of federal financial assistance, such as these defendants, they have an affirmative obligation to ensure that housing does not discriminate against persons with disabilities.    Since 1988, the Plaintiff, HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC. ("HOPE")[9] employs a three-tiered system of private enforcement, education outreach and counseling to achieve its mission to affirmatively further fair housing in South Florida. Its programs are designed to ensure that people are offered the right to select housing of their choice without discrimination based on race, religion, color, national origin, sex, disability, marital or familial status, or such other protected classes as may be conferred by federal, state or local laws.

## A.  STANDARD FOR A PRELIMINARY INJUNCTION

"A district court may grant injunctive relief if the movant shows the following: (1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." McDonalds Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998).

### 1.  SUBTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

#### a.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT DEFENDANTS FAILED TO PROVIDE REASONABLE ACCOMMODATIONS FOR ITS TENANTS

The Defendants included a "Fair Housing Statement", expressly discouraged accommodations or modifications under the Fair Housing Act, and these Defendants do not know how to provide accommodations under the Act.  Ms. CARTER is in the hospital because of the Defendant's failure to provide grab bars. It's just a matter of time before Mr. QUINONES' wheelchair falls on him, and Ms. CANO still does not have a designated assigned parking spot. These are people who have been assisted by HOPE in their attempts to get an accommodation and have been stymied.

---

[9]  See the Declaration of Keenya Robertson filed contemporaneously with this motion.

It is unlawful for a housing provider to discriminate against a person with a disability by not making a reasonable accommodation necessary for the use and enjoyment of one's dwelling. Congress passed the original Fair Housing Act ("FHA") as Title VIII of the Civil Rights Act of 1968. The FHA Amendments of 1988 (hereinafter "FHAA") expanded the FHA by including handicapped persons in those classes protected from discrimination in housing. H.R.Rep. No. 711, 100th Cong., 2nd Sess., at 13 (1985). The FHAA does this by making persons with disabilities a protected class under the statute. Bangerter v. Orem City Corp., 46 F.3d 1491, 1503 (10th Cir. 1995). The FHAA is "a broad mandate to eliminate discrimination against and equalize housing opportunities for disabled individuals." Bronk v. lneichen, 54 F.3d 425, 428 (7th Cir. 1995).

The FHAA makes it unlawful to either: (1)"discriminate in the sale or rental [of], or to otherwise make unavailable or deny, a dwelling[,]" to a handicapped person, 42 U.S.C. § 3604(f)(1); or (2) "discriminate against any [handicapped] person in the terms, conditions, or privileges of sale or rental of a dwelling[,]" 42 U.S.C. § 3604(f)(2). Handicap discrimination includes "a refusal to make reasonable accommodation in rules, policies, practices or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). *See also* 24 C. F. R. § 100.204.

To prevail on a section 42 U.S.C. § 3604(f)(3)(B), the plaintiffs must establish that, (1) plaintiffs are disabled within the meaning of the FHA, (2) she requested a reasonable accommodation, (3) such accommodation was necessary to afford her an opportunity to use and enjoy the dwelling, (4) Defendants refused to make the requested accommodation Hawn v. Shoreline Towers Phase I Condominium Ass'n, Inc., 347 Fed. App'x 464, 467 (11th Cir. 2009).

Further, as a housing provider of federally subsidized housing, these defendants are obligated to operate the Subject Apartments so that existing housing programs are readily accessible to and usable by individuals with disabilities. 24 C.F.R. § 8.24. Pursuant to Section 504 of the Rehabilitation Act, **an entity must pay** for a reasonable accommodation needed by the individual unless providing that accommodation would be an undue financial and administrative burden or a fundamental alteration of the program. 24 C.F.R. §§ 8.4, 8.11, 8.20, 8.21, 8.24, 8.25, 8.33.

There is no question that these persons have disabilities and have been previously been designated as persons with disabilities by these Defendants.  The Plaintiff must show that the

requested accommodation "may be necessary" to afford her equal opportunity to use and enjoy their unit. This "necessity" concept requires "at a minimum the showing the desired accommodation will affirmatively enhance a disabled Plaintiff's quality of life by ameliorating the effects of the disability." Dadian v. Village of Wilmette, 269 F.3d 831, 838 (7th Cir. 2001); *see also* Trovato v. City of Manchester, 992 F. Supp. 493, 497 (D.N.H. 1997) ("necessity" element satisfied where mobility-impaired Plaintiffs demonstrated that "they would derive great benefit from a parking space in their front yard and the lack thereof has adversely affected their 'use or enjoyment' of their home.")  Each of these accommodations requested are customarily used by persons with disabilities.

Grab-bars in a bathroom and a ramp at the entrance of a unit for a person with a disability are regulatory examples of a reasonable accommodation in which a housing provider that is a recipient of federal financial assistance is obligated to pay for. The guidance by the enforcing authorities is specific in stating that it is the responsibility of a housing provider that receives federal financial assistance to pay for such reasonable accommodations under Section 504 of the Rehabilitation Act and provides the following accompanying examples:

**31. Are the rules the same if a person with a disability lives in housing that receives federal financial assistance and the needed structural changes to the unit or common area are the result of the tenant having a disability?**

Housing that receives federal financial assistance is covered by both the Fair Housing Act and Section 504 of the Rehabilitation Act of 1973. Under regulations implementing Section 504, structural changes needed by an applicant or resident with a disability in housing receiving federal financial assistance are considered reasonable accommodations. They must be paid for by the housing provider unless providing them would be an undue financial and administrative burden or a fundamental alteration of the program or unless the housing provider can accommodate the individual's needs through other means. ….

**Example 2**: A tenant who uses a wheelchair and who lives in housing that receives federal financial assistance needs a roll-in shower in order to bathe independently. Under Section 504 of the Rehabilitation Act of 1973, the housing provider would be obligated to pay for and install the roll-in shower as a reasonable accommodation to the tenant unless doing so was an undue financial and administrative burden or unless the housing provider could meet the tenant's disability-related needs by transferring the tenant to another appropriate unit that contains a roll-in shower.

See Joint Statement of the United States Department of Housing and Urban Development and the Department of Justice, *Reasonable Modifications under the Fair Housing Act* (March 5, 2008).[10] The assignment of a parking place in close proximity to the building is a reasonable accommodation to afford plaintiff an equal opportunity to use and enjoy the dwelling is the regulatory example of an accommodation under the Fair Housing Act. 24 C.F.R. § 100.204(b). See Rusinov v. Jankowski Lee & Assoc., No. 05-93-0517-1, 1995 WL 399384 at *10 (H.U.D.A.L.J. June 20, 1995); Shapiro v. Cadman Towers, Inc., 51 F.3d 328 (2$^d$ Cir. 1995). Further, this court has previously found that the denial of a ramp into a storage closet is a violation of the Fair Housing Act and granted a preliminary injunction.  See Jacobs v. Concord Village Condominium X Association, Inc., 2004 U.S. Dist LEXIS 4876 (S.D. Fla.  2004),

Here, it is clear that Defendants have routinely delayed or denied requests for accommodations and modifications made by tenants. See Sabal Palm Condos. of Pine Island Ridge Ass'n v. Fischer, 2014 U.S. Dist. LEXIS 36040, 19 (S.D. Fla. Mar. 19, 2014)("When the person requesting an accommodation provides enough reliable information such that the only reasonable conclusion is that the accommodation request should be granted, the housing provider's denial of the request or undue delay in making a decision violates the FHA.")  As such, Plaintiffs are more than likely to succeed on their claim that defendants failed to provide reasonable accommodations months after the requests for its tenants.

### b.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT DEFENDANTS ARE PROHIBITED IN REQUIRING MEDICAL RECORDS RELEASES OR DIRECTLY CONTACTING MEDICAL PROFESSIONALS.

Defendants' policies and procedures, including requirements for tenants with disabilities to sign a "Handicapped/Disabled Verification Form" and authorize the release of *any* information requested by defendants related to the residents' disability status are unlawful. Requiring residents to sign a release which authorizes defendants to obtain *any* medical records and to directly contact a resident's health care providers is a demand for irrelevant, invasive and burdensome information, over and above the role of any housing provider.

The defendants' rules, on their face, are in violation of the Fair Housing Act in that these rules permit an invasive examination of one's disabilities, require undue costs on behalf of the

---

[10] Guidance located at
http://www.hud.gov/offices/fheo/disabilities/reasonable_modifications_mar08.pdf.

person with a disability, and then even if the accommodation is approved, limits the person with a disability's right to equal use and enjoyment of the premises. In Sabal Palm Condos, 2014 U.S. Dist. LEXIS at  52 , Judge Scola found that the condominium association's requests for medical information, when such information was not needed to determine the necessity of the accommodation, was a violation of the Act, and constituted a constructive denial of an accommodation because it was tantamount to stonewalling and short-circuiting the reasonable accommodation process. Id.  Such rules and regulations in this matter not only serves only to stonewall the process, but it also discourages and obstruct choices in the community and place discriminatory limitations on the person's use and enjoyment of the property. As such, plaintiffs are likely to succeed on their claims that defendants are prohibited from requiring medical records releases or directly contacting medical professionals in response to a request for an accommodation due to a disability.

### c.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT DEFENDANTS ARE PROHIBITED IN LIMITING THE USE OF PUBLIC AMENITIES TO FAMILIES WITH CHILDREN OR ENFORCING A CURFEW

By establishing and enforcing rules that treat children differently from adults, the Defendants violated the Act by discriminating "against any person in … the provision of services or facilities in connection therewith, because of ….familial status."  42 U.S.C. §3604(b)  By promulgating these discriminatory occupancy standards to purchase or rent at the Subject Apartments, the Defendant violated the Act "by making, printing or publishing, or causing to be made, printed or published statements and advertisements, with respect to the rental or sale of a dwelling that indicated a preference, limitation, or discrimination based on familial status," which is specifically prohibited by the statute that is codified at 42 U.S.C. § 3604(c) and the regulations that are found at 24 CFR 100.75(b)(c)(1)(2).

In Fair Housing cases, courts apply the same method of analysis developed for use in cases under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e-17. See Secretary, United States Dep't of Housing and Urban Development v. Blackwell, 908 F.2d 864 (11th Cir. 1990).  Under this approach, a plaintiff may present either direct evidence of discriminatory or retaliatory intent, manifested by the actions or remarks of the defendant, or use the factors set forth in burden-shifting analysis developed by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668

(1973), to raise, by indirect or circumstantial evidence, an inference of discrimination. See <u>Hill v. Metropolitan Atlanta Rapid Transit Authority</u>, 841 F.2d 1533, 1538 (11th Cir. 1988). The Eleventh Circuit has found that that proof of discriminatory purpose is not necessary to establish a Title VIII violation; rather, the plaintiffs need only to prove that the challenged action had a discriminatory effect to establish a prima facie violation of Title VIII. See <u>Jackson v. Okaloosa County</u>, 21 F.3d 1531, 1543 (11th Cir. 1994). FHA claims can be established by either a theory of disparate treatment or disparate impact. <u>Harris v. Itzhaki</u>, 183 F.3d 1034, 1051 (9th Cir. 1999). Once a *prima facie* case is established, defendants must articulate a legitimate justification for their rules. <u>United States v. Badgett</u>, 976 F.2d 1176, 1178 (8th Cir. 1992); <u>Blackwell</u>, 908 F.2d at 871. In making that showing, defendants must establish that their rules constitute a compelling business necessity and that they have used the least restrictive means to achieve that end. <u>Fair Housing Council v. Ayres</u>, 855 F. Supp. 315, 318-19 (C.D.Cal. 1994); <u>U.S. v. M. Westland Co.</u>, CV 93-4141, Fair Housing-Fair Lending P15,941 (HUD ALJ 1994). The Fair Housing Act and the Florida Fair Housing Act's statutory provisions are substantively identical. <u>Loren v. Sasser</u>, 309 F.3d 1296, 1300 n.9 (11th Cir. 2002)

By themselves, the banning of certain items is not discriminatory; however, when such a given statement or rule suggests a preference for adults, or limits or conditions the use of privileges or facilities because of familial status, it is a violation of 42 U.S.C. § 3604(b), as applied, and 42 U.S.C. § 3604(c) as published. <u>Fair Housing Congress v. Weber</u>, 993 F.Supp. 1286 (C.D. Cal. 1997); <u>United States v. Plaza Mobile Estates</u>, 273 F.Supp. 2d 1084 (C.D.CA 2003); <u>Llanos v. Estate of Coehlo</u>, 24 F. Supp. 2d 1052 (E.D. CA 1998). The standard for determining whether a given statement [or rule] violates § 804(c) is whether the statement suggests a preference to the ordinary reader of listener. <u>U.S. v. Hunter</u>, 459 F.2d 205, 215 (4th Cir.) *cert. denied*, 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed. 2d 189 (1972).

> Limiting the use of privileges and facilities associated with a dwelling because of familial status is a violation of § 804(b). 24 C.F.R. § 100.65(b)(4). Plaintiff [makes] out a prima facie case of discrimination by showing facially discriminatory rules which treat children, and thus, families with children, differently and less favorably than adults-only households. <u>United States v. Badgett</u>, 976 F.2d 1176 (8th Cir. 1992). Once a prima facie case is established, defendants must articulate a legitimate justification for their rules. <u>Badgett</u>, 976 F.2d at 1178. In making that showing, defendants must establish that their rules constitute a compelling business necessity and that they have used the least restrictive means to achieve that end. Fair Housing Council v. Ayres, 855 F.

Supp. 315, 318-19 (C.D. Cal. 1994); U.S. v. M. Westland Co., CV 93-4141, Fair
Housing-Fair Lending P15,941 (HUD ALJ 1994).

Id. at 1292.  See also United States v. Plaza Mobile Estates, 273 F.Supp. 2d 1084 (C.D.CA 2003). There is **no** rational or reasonable basis for forbidding children from playing or loitering in common areas, imposing a curfew or limiting swimming time to business hours. In fact, a similarly discriminatory rule was briefly discussed in Tropic Seas, 887 F.Supp. at 1352-53, and was withdrawn by the association upon the FHA becoming effective.

HOPE also brings a claim under § 3604(c) of the Fair Housing Act which prohibits making, printing, or publishing "any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination." 42 U.S.C.A. § 3604(c).  As such, the publication of these rules also serve to dissuade persons with families and children from moving into these premises as well.

## 2. PLAINTIFFS WILL SUFFER IRREPARABLE INJURY UNLESS THE INJUNCTION ISSUES AND THE THREATENED INJURY TO THE PLAINTIFFS FAR OUTWEIGHS ANY HARM WHICH THE INJUNCTION MAY CAUSE

In this matter, Ms. Carter has already been injured.  Ms. Cano is injured by not having a first floor apartment and each time she needs to walk further to her car.  It's just a matter of time before others are injured as well.  Further, it is the summer, and there is no justification for barring children from the pool or not allowing children outside at night.  In enacting the Fair Housing Act, Congress has spoken loudly to the point that discrimination is not to be tolerated. The Eleventh Circuit has taken the position that a showing of substantial likelihood that a defendant has violated the FHA is itself sufficient to create a presumption of irreparable harm which shifts the burden to defendant to prove that any injury that may occur is not irreparable. Gresham v. Windrush Partners, Ltd., 730 F.2d 1417,1423 (11th Cir. 1984), *cert. denied sub nom.* Windrush Partners v. Metro Fair Housing Services, 469 U.S. 882 (1985), (*citing* United States v. Hayes International Corporation, 415 F.2d 1038, 1045 (5th Cir. 1969)). In Hayes, the former Fifth Circuit concluded that, while an injunction

> "does not follow as a matter of course upon either a finding or
> stipulation of violation of some Act of Congress," 415 F.2d at 1044,
> where statutory rights are involved and an injunction is authorized

> by statute and the statutory conditions are satisfied * * * the usual
> prerequisite of irreparable injury need not be established and the
> agency to whom the enforcement of the right has been entrusted is
> not required to show irreparable injury before obtaining an
> injunction.
>
>        * * *
>
> We take the position that in such a case, irreparable injury should be
> presumed from the very fact that the statute has been violated.

415 F.2d. at 1045 (footnote and citations omitted). While such a presumption can be rebutted, it is clear from the rationale for the presumption that the defendant bears a heavy burden of proof to establish such a rebuttal. Gresham, *supra,* 730 F.2d at 1423-24; Rogers v. Windmill Pointe Village Club Ass'n, Inc., 967 F.2d 525, 527 (11th Cir. 1992). Further, as a result of the acts and conduct of the Defendants, Plaintiff HOPE has suffered and continues to suffer interference with its mission, diversion of its resources and obstruction of its purpose of ensuring equal housing opportunities throughout South Florida free from disability or familial status discrimination. Defendant's discriminatory actions have (1) interfered with the efforts and programs of HOPE which are intended to bring about equality of opportunity for all persons; (2) forced HOPE to devote scarce resources to identify and counteract Defendants' unlawful housing practices and to otherwise divert those same resources from its education, counseling, and referral services; (3) interfered with the right of HOPE's constituents to enjoy the benefits of living in a community which does not discriminate against persons based on disabilityand familial status; and, (4) frustrated HOPE's mission and purpose of ending housing discrimination and promoting the equal availability of housing to all persons without regard to race, color, religion, gender, national origin, familial status, or disability.  Because of disability, Defendants have restricted the independence of persons with disabilities.  Such acts perpetuate substandard housing in the Miami-Dade, and discourage and obstruct choices in the community.  On the other side of the balance, there is simply no harm to Defendant if it is forced to comply with the law – it is their legal obligation to do so.  The additional relief demanded will require that the defendants retain an independent management agent to operate their development which is the only way to ensure that the discrimination which is occurring on an everyday basis ceases. Plaintiffs and the community of Miami-Dade are being harmed every day Defendant's action continues and a preliminary injunction should issue.

### 3.  THE PUBLIC INTEREST CLEARLY SUPPORTS INJUNCTIVE RELIEF

The broad public interest in providing protection against discrimination in housing decidedly tips the balance of equities in favor of the entry of a preliminary injunction. Congress declared the public interest when it enacted the Fair Housing Act. As the Supreme Court stated "if we are to give [the law] the scope that is origins dictate, we must accord it a sweep as broad as its language." Jones v. Alfred Mayer Co., 392 U.S. 409, 437 (1968). Defendant's interest in continuing discriminatory practices is simply subservient to the preemptive effect of the federal civil rights laws as enacted by Congress. See Alexander v. Gardner-Denver Co., 415 U.S. 36, 51 (1974) ("Title VII's strictures are absolute and represent a Congressional command that each employee be free from discriminatory practices."). Congress and the courts have emphatically declared that the public interest is served by effective enforcement of the Fair Housing Act. Here, where the Fair Housing Act authorizes an action when necessary to "carry out the purposes" of the Act, 42 U.S.C. § 3610(e), the public interest is clearly served by entry of the requested relief.

WHEREFORE, HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC., PAMELA CARTER, CARLOS QUINONES, VANESSA CANO BERTHENIA MANNINGS, individually and as parent of K.M., GRACIELA CISNEROS, and JULIAN MITCHELL respectfully requests that this Court ORDER and ENJOIN Defendant, MIAMI PROPERTY GROUP, LTD., CHARTER REALTY GROUP, INC., and PAULETTE GOPAUL, its principals, officers, agents, and employees, to immediately cease and desist discriminating against persons based on disability, familial status and gender, including the following relief:

1. That the Defendants immediately hire an outside property management company to perform the management functions on its property;

2. That the Defendants immediately post the requirements of the Fair Housing Act prominently in its leasing office and in each common area on the property.

3. That the Defendants immediately Conduct a survey of all residents to determine if a resident has a disability, and if the resident voluntarily discloses a disability, inquire what modifications are required in their homes, which may include, but not limited to:

   a. Ramps to get in and out of a residence;

   b. Grab bars at toilets or bathtubs;

   c. Widening of doors;

    d.  Levers at doors, instead of knobs;

    e.  Designated assigned parking places;

    f.  Switches and sockets within reach range;

    g.  Assignments to first floor units, when available.

4. Require all such modifications to be completed within sixty (60) days.

5. Deem unenforceable rules such as:

    a.  Curfew for children under 18 years old;

    b.  Children not being permitted to use the playground unless they are supervised by someone who is 18 years old

    c.  Woman who are victims of domestic violence can be evicted due to an assault on them

6. Require the Defendants to allow access to the swimming pool during at times other than normal business hours, and allow tenants to use the pavilions for activities.

7. Prohibit inquiries on the nature and extent of a disability, especially where no accommodations are requested.

8. Any such further relief as this Court deems just and equitable.

Respectfully submitted on this 10th day of June, 2014.

**DISABILITY INDEPENDENCE GROUP, INC.**
2990 Southwest 35th Avenue
Miami, Florida 33133
Tel:  (305) 669-2822
Fax:  (305) 442-4181
Email: Mdietz@justDIGit.org

By: s/ Matthew W. Dietz
    MATTHEW W. DIETZ, ESQ.
    Florida Bar No.: 0084905